**In re ORCHARD ENTERPRISES, INC. STOCKHOLDER LITIGATION.**

**C.A. No. 7840–VCL**

Court of Chancery of Delaware.

Submitted: Jan. 9, 2014.
Decided: Feb. 28, 2014.

See also 2012 WL 2923305.

4

Peter B. Andrews, Faruqi & Faruqi, LLP Wilmington, Delaware; Samuel J. Lieberman, Paulina Stamatelos, Sadis & Goldberg LLP, New York, New York; James S. Notis, Jennifer Sarnelli, Jonathan A. Adler, Gardy & Notis, LLP, New York, New York; Attorneys for Plaintiffs.

William M. Lafferty, Jay N. Moffitt, Bradley D. Sorrels, Christopher P. Quinn, Morris, Nichols, Arsht & Tunnell LLP, Wilmington, Delaware; Attorneys for Defendants Michael Donahue, David Altschul, Viet Dinh, Joel Straka, and Nathan Peck.

Philip Trainer, Jr., Toni–Ann Platia, Ashby & Geddes, P.A., Wilmington, Delaware; Kenneth J. Pfaehler, David I. Ackerman, Dentons U.S. LLP, Washington, District of Columbia; Attorneys for Defendants The Orchard Enterprises, Inc., Dimensional Associates, LLC, Daniel Stein, and Bradley Navin.

## OPINION

LASTER, Vice Chancellor.

In 2010, Dimensional Associates, LLC ("Dimensional") squeezed out the minority stockholders of The Orchard Enterprises, Inc. ("Orchard" or the "Company"). The merger consideration was $2.05 per share. In 2012, Chief Justice Strine, writing while Chancellor, determined that the fair value of the common stock at the time of the merger was $4.67 per share. *See In re Appraisal of The Orchard Enters., Inc.,* 2012 WL 2923305, at *8 (Del.Ch. July 18, 2012), *aff'd,* —— A.3d ——, 2013 WL 1282001 (Del. Mar. 28, 2013) (TABLE). In this plenary action, the plaintiffs contend that Dimensional and the directors who approved the merger breached their fiduciary duties and should be held liable for damages.

After completing fact discovery, the parties filed cross motions for summary judgment. The plaintiffs contend that the defendants breached their duty of disclosure, that entire fairness is the operative standard of review, and that the merger was not entirely fair. They claim that Dimensional, Daniel Stein, Bradley Navin, and Michael Donahue breached their duty of loyalty and that judgment should be entered against them as a matter of law. Various combinations of defendants resist these determinations, contend that neither rescissory damages nor quasi-appraisal are available remedies, and assert that the directors who served on a special committee are exculpated from liability. The plaintiffs oddly named Orchard as a defendant, and Orchard adds that it cannot be held liable for breach of fiduciary duty or for aiding and abetting.

The plaintiffs' motion is denied except in two respects: one of the claimed disclosure violations was a material misrepresentation, and the standard of review for trial will be entire fairness with the burden of persuasion on the defendants. The defendants' motions are denied except in two respects: one of the alleged disclosure violations was factually accurate, and Orchard cannot be held liable on the theories asserted.

## I. FACTUAL BACKGROUND

The facts are drawn from the materials presented in support of the cross-motions for summary judgment. When considering the plaintiffs' motion, conflicts in the evidence must be resolved in favor of the defendants, and all reasonable inferences drawn in their favor. When considering the defendants' motion, the opposite is true. The evidence in the record conflicts on many issues and can support competing inferences. At this stage of the case, the court cannot weigh the evidence, decide among competing inferences, or make factual findings.

### A. Orchard And Dimensional

Orchard is a Delaware corporation that distributes music and video through digital stores and mobile carriers. Orchard's common stock traded on NASDAQ until the merger. The parties have sharply divergent views about Orchard's business prospects going into the merger, and each side has evidence that supports its view.

Dimensional is a private equity fund. Non-party Joseph D. Samberg is the founder of JDS Capital Management, LLC, the ultimate parent of Dimensional. He is also a senior executive officer of Dimensional.

Since 2007, Dimensional has controlled Orchard. As of the 2010 squeeze-out, Dimensional and its affiliates held approximately 42% of Orchard's common stock (2,738,327 shares) and 99% of its Series A convertible preferred stock (446,918 shares). Through these holdings, Dimensional wielded approximately 53.3% of Orchard's outstanding voting power.

Under an agreement that governed a transaction in 2007 that created Orchard, Dimensional received the right to designate four of the seven members of Orchard's board of directors (the "Board"). Its designees were Greg Scholl, Stein, Donahue, and Viet Dinh.

Scholl served as Orchard's CEO until his resignation in September 2009. He is not a defendant in this action.

Stein is an executive officer and a director of Dimensional. He acted as the point man for Dimensional in the events giving rise to the merger.

Donahue is a nominally disinterested and independent director. He served as Chairman of the Board and as Chair of the special committee formed to negotiate with

Dimensional. As Chair of the special committee, he acted as the point man for Orchard in negotiating with Stein.

Discovery revealed that Donahue has long-standing ties to members of the Samberg family. Donahue and Jeff Samberg, who is Joseph's brother, have been business associates and personal friends for approximately twenty years. They attended the NCAA Final Four together every year from 1999 to 2008, and they have invested together in fifteen different companies, either directly or through Greylock Partners, a venture capital fund. Donahue and Arthur Samberg, Joseph and Jeff's father, are also long-time friends.

Discovery further revealed that during the negotiation of the merger, Donahue approached Dimensional about serving as a consultant to Orchard after the merger closed. He got the job and provided post-closing consulting services for annual compensation of approximately $108,000.

Dinh is a facially disinterested and independent director. The plaintiffs have not identified any conflict-creating ties between Dinh and Dimensional, its principals, or Orchard.

## B. The First Dimensional Proposal

On November 12, 2008, Stein informed the Board that Dimensional planned to contact third parties about buying Orchard or participating with Dimensional in taking it private. Stein asked the Board to direct management to cooperate with Dimensional and meet with interested parties. Stein also asked the Board to authorize the Company to enter into non-disclosure agreements with interested parties.

On November 14, 2008, the Board agreed to Dimensional's requests and formed a special committee of independent directors (the "Initial Special Committee") to oversee the Company's involvement.

The committee members were Donahue, Dinh, Nathan Peck, and Joel Straka. Like Dinh, Peck and Straka were facially disinterested and independent directors. Donahue, the director with the closest relationship to Dimensional, served as Chair of the Initial Special Committee. The committee hired legal counsel, Patterson Belknap Webb & Tyler LLP ("Patterson Belknap"), and determined that depending on the type of transaction proposed, they might need to retain a financial advisor.

Dimensional contacted fifty-three parties, and eleven entered into non-disclosure agreements with the Company. Eight met with Company management. Two parties—Stripes Group and Sony Music—expressed interest after the management meetings. Stripes Group submitted an initial proposal, and discussions continued with both Stripes Group and Sony Music through March 2009. Sony Music did not make a formal proposal, and Dimensional terminated the process in April 2009. At that point, the Board dissolved the Initial Special Committee.

## C. The Second Dimensional Proposal

Five months later, in September 2009, Scholl announced his resignation as CEO, and the Board appointed Stein to serve as interim CEO in his place. On October 9, Stein contacted his fellow directors individually, told them that Dimensional was considering a going-private transaction, and proposed that the subject be discussed at the next Board meeting on October 13. On October 15, Dimensional delivered a formal proposal to squeeze out the minority for $1.68 per share, a 25% premium to the then-current stock price of $1.35 per share.

In response, the Board formed a second special committee (the "Special Committee"). The Board gave the Special Committee the exclusive power and authority

to (i) negotiate the terms of a transaction with Dimensional, (ii) terminate consideration of Dimensional's proposal, (iii) solicit interest (or respond to inquiries) from third parties, and (iv) retain independent legal and financial advisors of its choosing.

The members of the Special Committee were Dinh, Donahue, Peck, Straka, and David Altschul. Except for Altschul, all had served on the Initial Special Committee. Altschul also is a facially disinterested and independent director. Donahue again served as Chair. Patterson Belknap again served as legal counsel. This time, the Special Committee hired Fesnak & Associates, LLP ("Fesnak") to provide financial advice and to opine on the financial fairness of a transaction with Dimensional.

### D. The Initial Negotiations

On October 24, 2009, Donahue told Stein that the Special Committee wanted him to resign as interim CEO in light of Dimensional's proposal. Donahue also told Stein that Dimensional's price was low. Later that day, Stein called back and indicated that Dimensional would increase its offer to $1.84 per share. On October 27, Stein resigned as interim CEO. He continued to serve as a director. The Board appointed Navin, previously the Company's Executive Vice President and General Manager, as interim CEO in Stein's place.

On October 30, 2009, the Company filed a Form 8–K disclosing Stein's resignation, Navin's appointment, Dimensional's initial proposal, and the subsequent increase from $1.68 to $1.84. The announcement stirred some third party interest. First to reach out was Tuhin Roy, a former executive of the Company's predecessor, who spoke with Donahue about making an alternative proposal. On November 7, Roy sent the Special Committee a letter expressing interest in a potential transaction and asking to be considered as a candidate for the CEO position. Donahue encouraged Roy to make a more formal transaction proposal.

Internally, the Special Committee worked with Fesnak and management to value Orchard's common stock. A key input was how to value the Series A. As preferred stock goes, the Series A was not a strong security. It did not have preferential cash flow rights and merely participated on an as-converted basis with the common in any dividend or distribution. For the conversion calculation, each Series A share equated to 3.33 shares of common, subject to adjustments for splits, combinations, and distributions. The Series A did carry an aggregate liquidation preference of $24.99 million, but the preference would be triggered only by a "voluntary or involuntary liquidation, dissolution or winding up" of Orchard. Transmittal Declaration of Samuel J. Lieberman (the "Lieberman Decl.") Ex. 4 (the "Series A Certificate") § 2(a). The certificate of designations did not define liquidation broadly, nor did it give the Series A an extensive list of consent rights. The Series A also was not participating preferred, so after the payment of the liquidation preference, the common stockholders would "receive the remaining assets and funds of the Corporation." Series A Certificate § 2(b).

For purposes of Dimensional's squeeze-out proposal, the key question was whether to value the Series A on an as-converted basis or to base the valuation on the $25 million liquidation preference. The appraisal decision illustrates the significance of this issue. There, Chief Justice Strine held that the going concern value of Orchard was $36.8 million. If the Series A were credited with its full liquidation preference of $25 million, then 70% of that amount would go to the Series A, leaving the common stock with $1.85 per share. If the Series A were valued on an as-convert-

ed basis, then 19% of the value would go to the Series A, leaving the common stock with $4.67 per share, the amount awarded in the appraisal.

A critical input for valuing the Series A was Section 2(c) of the Series A Certificate, which stated:

*Payments and Distributions Upon Change of Control Event.* For so long as any shares of Series A Preferred Stock remain outstanding, the Corporation shall not enter into or otherwise effect any transaction (or series of transactions) constituting a Change of Control Event (as defined below) unless (i) with respect to a Change of Control Event involving the sale or exclusive license of all or substantially all of the Corporation's assets or intellectual property . . . the Corporation shall as promptly as practicable thereafter liquidate, dissolve and wind up the Corporation and distribute the assets of the Corporation . . . to the Corporation's stockholders in accordance with Subsections 2(a) and 2(b) and (ii) with respect to a Change of Control Event involving a transaction in which the stockholders of the Corporation will receive consideration from an unrelated third party, the agreement governing such transaction (or series of transactions) provides that the consideration payable to the stockholders of the Corporation (whether in cash, securities or other property) shall be allocated among them in accordance with Subsections 2(a) and 2(b).

*Id.* § 2(c). The basic definition of a "Change of Control Event" included a merger or consolidation in which the Company or one of its subsidiaries was a constituent party, and it therefore encompassed a Dimensional squeeze-out. An exception to the basic definition excluded any merger or consolidation in which the holders of capital stock of the Company immediately before the merger continued to hold at least 51% of the capital stock of the post-transaction entity "in approximately the same proportion as such shares were held immediately prior to such merger or consolidation." *Id.* § 2(c)(A). A squeeze-out would not fall into the exception.

Although Dimensional has tried to portray Section 2(c) as a protective provision that benefited the Series A and Dimensional, it actually limited Dimensional's flexibility. Under the plain language of the provision, Dimensional could not engage in a squeeze-out. Section 2(c) called for Dimensional to receive its liquidation preference in a third party deal, but only if all of the transaction proceeds were distributed to Orchard's stockholders. Otherwise Section 2(c) blocked Orchard from engaging in transactions that could constitute a Change of Control Event. This decision therefore refers to Section 2(c) as the "Change of Control Block."

In late October 2009, Orchard's CFO, Nathan Fong, prepared a memo that analyzed Dimensional's proposal and the value of the Series A. Lieberman Decl. Ex. 2 (the "CFO Memo"). The CFO Memo correctly stated that a Dimensional minority buyout would not trigger the liquidation preference:

*Purchase by Dimensional of all outstanding shares of common stock not owned by Dimensional*

. . . Under these circumstances, the minority stockholders would receive compensation for their shares in an amount equal to the price per share offered by Dimensional multiplied by the number of shares owned.

*Sale to a Third Party of a Controlling Interest in The Orchard*

In the event that Dimensional a sale [sic] of the company is consummated to a third party, the Series A Preferred

Stockholders would be entitled to receive the first $24,992,980 of the proceeds....

CFO Memo at ORCHARD16954. On October 29, 2009, Fong emailed the CFO Memo to Michael Wolfe of Fesnak and to Special Committee members Donahue and Straka. The CFO Memo was reviewed with the full Board on December 11, 2009.

During a meeting on November 12, 2009, Fesnak provided the Special Committee with a preliminary valuation analysis. In those materials, Fesnak used a discounted cash flow methodology to calculate values for the company under three cases, labeled "aggressive," "neutral," and "worst." After giving 60% weight to the neutral case and 20% weight to the other cases, Fesnak determined that the minority shares of common stock for purposes of a Dimensional squeeze-out had a value of $4.84 per share. For purposes of the valuation, Fesnak valued the Series A on an as-converted basis. Fesnak did not use the $25 million face value of the liquidation preference. The Special Committee reviewed and discussed Fesnak's preliminary valuation.

In a November 17, 2009 email, Fong valued the Series A in the aggregate at just $7 million. He concluded: "I cannot see how the special committee can recommend Dimensional's offer to the minority share holders [sic]." Lieberman Decl. Ex. 3.

**E. Roy Returns.**

On November 18, 2009, Roy proposed to acquire all of Orchard's outstanding common stock for between $2.36 and $2.84 per share and all of the Series A for a combination of cash and equity in the post-transaction entity. The offer was conditioned on Roy's investor group obtaining financing. The Special Committee authorized the Company to enter into a non-

disclosure agreement with Roy and permitted Roy to access the Company's electronic data room.

On November 23, 2009, Donahue spoke with Stein about Dimensional's squeeze-out proposal. Donahue told Stein that a third party had made a higher bid. Stein represented that Dimensional would sell to a third party as long as Dimensional received its full liquidation preference for the Series A. Based on Stein's representation that Dimensional would sell to a third party, the Special Committee told Roy to negotiate with Dimensional directly. Dimensional also negotiated directly with other third party bidders, with at least one other bidder being referred to Dimensional by the Special Committee.

On December 10, 2009, Stein told Donahue that Dimensional was not interested in Roy's bid because Roy would not pay the full liquidation preference for the Series A. Stein also cited a financing contingency in Roy's bid. On December 11, 2009, Roy withdrew his proposal because he was unable to reach an agreement with Dimensional.

**F. The December 11, 2009 Meeting**

On December 11, 2009, the Special Committee met. Stein attended a portion of the meeting and gave the same report on his discussions with Roy. Stein again represented that Dimensional would sell to a third party that offered pay the liquidation preference for the Series A. After Stein left, the Special Committee concluded that they would recommend a transaction with Dimensional on three conditions. First, the price offered for the common stock had to be at least in the range of $2.05 to $2.15 per share, subject to Fesnak's confirmation that such a price would be fair. Second, the merger would have to be conditioned on the affirmative vote of a majority of the minority stockholders. Third, the

merger agreement had to provide for a "go-shop" period.

The plaintiffs are deeply skeptical of the Special Committee's good faith in deciding to proceed on these conditions. They note that at the time the Special Committee made its decision, they had received advice from multiple sources indicating that the common stock would have a much higher value because the Series A liquidation preference was not triggered by a squeeze-out. The CFO Memo made this point. So did two prior memos from different outside consultants who each concluded that the Series A was not worth $25 million because there was "little to no chance" that the liquidation preference would be triggered. Lieberman Decl. Ex. 32 at ORCH53449. Both consultants valued the Series A on an as-converted basis at approximately $7 million.

## G. The Final Price Negotiations

On December 14, 2009, Donahue conveyed the Special Committee's position to Stein. Stein countered at $2.00 per share with a go-shop but without a majority-of-the-minority condition. He again represented that Dimensional would sell to a third party that would pay the Series A's liquidation preference. On December 16, 2009, a third party strategic bidder contacted Donahue about a transaction.

Between December 14 and 21, 2009, Donahue and Stein continued to negotiate. On December 18, Stein raised Dimensional's offer to $2.10 per share with a go-shop but without a majority-of-the-minority condition. On December 28, another third party bidder contacted Orchard about a potential transaction.

On January 7, 2010, Stein made a new offer. He lowered Dimensional's price from $2.10 to $2.00 but proposed to include a go-shop and a majority-of-the-minority voting condition. Dimensional also wanted its expenses reimbursed if the minority stockholders voted down the transaction. Dimensional thus presented the Special Committee with a stark and self-interested choice: a lower price with a majority-of-the-minority vote, which would give the Special Committee members greater personal protection against liability, or a higher price without the increased personal protection.

On January 12, 2010, the Special Committee met to consider Dimensional's revised proposal. Fesnak informed the Special Committee that its models suggested a value of between $2.00 and $2.10 per share of common stock. To derive those ranges, Fesnak valued the Series A using the full face amount of its $25 million liquidation preference. In the appraisal proceeding, Robert Fesnak testified that he changed his valuation models and valued the Series A at its full $25 million liquidation preference because the Special Committee told him to do so.

The Special Committee decided to ask Dimensional for $2.10 per share. Donahue spoke with Stein, and on January 13, 2010, Dimensional proposed to split the difference at $2.05 per share with a go-shop and a majority-of-the-minority condition. Dimensional said it was a best and final offer.

The Special Committee met again on January 14, 2010. Based on analyses that valued the Series A using the full face amount of its $25 million liquidation preference, Fesnak indicated that it could opine that Dimensional's price was fair. The Special Committee resolved to accept the offer.

## H. The Preparation Of The Transaction Documents

Over the next several weeks, Orchard and Dimensional prepared the transaction documents. During the negotiations, the

Special Committee asked Dimensional to give the minority stockholders a right to additional merger consideration if Dimensional turned around and sold Orchard to a third party for a higher price. Dimensional eventually agreed that if Dimensional sold 80% or more of Orchard's equity or assets within six months of the merger, then the minority stockholders would receive 15% of the upside.

Also during this period, Donahue interviewed three firms to conduct the go-shop process. On March 4, 2010, the Special Committee retained Craig–Hallum Capital Group LLC ("Craig–Hallum"). On March 15, the Special Committee met to consider the final transaction documents. Still valuing the Series A using the full face amount of its liquidation preference, Fesnak opined that the merger was fair from a financial point of view to the Company's common stockholders. In rendering its opinion, Fesnak relied on a March 15, 2010 letter from Donahue which represented that "[t]he preferred stock liquidation preference at March 15, 2010 is $24.993 million." Lieberman Decl. Ex. 35 at SC3083. Fesnak's fairness opinion disclaimed providing any independent valuation of the Series A. It states, "[W]e have not made an independent evaluation or appraisal of the assets and liabilities (including contingent . . . liabilities) of the Company." Lieberman Decl. Ex. 59 at ORCH12302. The Special Committee approved the merger agreement.

### I. The Go–Shop

During the go-shop process, Craig–Hallum contacted twenty-three strategic bidders and twelve financial buyers. Four entered into non-disclosure agreements. The go-shop was extended by one week, from 30 days to 37 days, to provide Craig–Hallum with additional time to complete discussions with two parties, one of which was Sony Music. No one submitted a formal proposal.

Meanwhile, shortly after the merger was announced, Rapfogel Partners Limited filed a putative class action in this court which contended that Dimensional and the Orchard directors breached their fiduciary duties by failing to pursue Roy's nominally higher proposal. Rapfogel moved for expedited proceedings, and the court denied the motion.

Roy then submitted a revised proposal for a transaction that valued Orchard at $40.99 million. Citing Roy's lack of committed financing, the Special Committee concluded that Roy's proposal was not reasonably likely to lead to a superior proposal for purposes of the no-shop clause in the merger agreement, and therefore Orchard could not talk to Roy. Roy asked to conduct due diligence, and the Special Committee declined, again citing the no-shop provision. Rapfogel renewed its motion to expedite, and the court again denied the motion.

### J. The Proxy Statement And Meeting Of Stockholders

On June 18, 2010, the Company disseminated its definitive proxy statement (the "Proxy Statement"). The Proxy Statement recommended that stockholders vote in favor of (i) the merger and (ii) an amendment to the Series A Certificate that would permit the Change of Control Block to be waived by the holders of a majority of the Series A (the "Block Amendment"). If the Block Amendment succeeded, then the Change of Control Block actually would become a protective right for the Series A, because the Company would not be able to engage in any transaction giving rise to a Change of Control Event unless (i) the transaction fell into the exception or (ii) the Series A gave their consent.

The Block Amendment technically was not conditioned on a majority of the minority vote, so Dimensional theoretically could approve it using its own voting power. But the Block Amendment was "conditioned upon and subject to the approval of the Merger Proposal." Proxy Statement at 90; *accord id.*, Letter to Stockholders at 2; *id.*, Notice at 1; *id.* at 8. If the merger proposal was not adopted, then the Block Amendment would not be presented. As a practical matter, the Block Amendment only would take effect if holders of a majority of the minority shares approved the merger.

Orchard held its meeting of stockholders on July 29, 2010. The merger was approved, with 58% of the unaffiliated shares voting in favor. The Block Amendment also was approved. The merger closed the same day.

Orchard's post-merger financial statements valued the Series A at $7,007,115, an amount consistent with its value on an as-converted basis. Orchard's audited December 31, 2010 financial statements also valued Orchard's preferred stock at $7,007,115. Orchard's unaudited statements for December 31, 2011 likewise valued the preferred stock at $7,007,115.

## K. Donahue Works For Dimensional As A Consultant On Orchard.

In July 2010, just before the stockholder meeting, Donahue emailed Navin, Orchard's interim CEO, and expressed interest in helping him work through some issues for Orchard after the merger closed. Donahue forwarded it to Stein, who thought it was an excellent idea. Six days after the merger, Donahue met with Navin, then emailed Joseph Samberg to say that he had "[j]ust finished meeting w [sic] Brad [Navin]" and was "very encouraged about his focus and direction for the biz." Lieberman Decl. Ex. 9 at SC51534. Eleven days after the merger, Donahue was consulting with Joseph Samberg about Orchard's financial statements and with Navin about whether to retain Orchard's CFO.

Dimensional paid Donahue $33,000 in cash plus $5,886.88 in reimbursed expenses for his immediate post-merger consulting work. In September 2010, Dimensional sent Donahue a term sheet for serving as a director and "Executive Consultant." He would receive $108,000 annually in cash, a grant of preferred stock worth $36,000, plus equity compensation as a director. In January 2011, Donahue entered into a Board Services and Consulting Agreement with Orchard, which provided him with 27,384 shares of the common stock. The contract recited that as of January 1, 2011, the Board had determined that the Company's common stock had a fair market value of $2.95 per share, giving the grant a value of $80,782.80. Donahue also received $189,000 in cash compensation from Orchard in 2011. His total 2011 remuneration from Orchard added up to at least $269,782.80.

## L. The Sale To Sony Music

On March 3, 2012, Dimensional signed a Master Purchase and Contribution Agreement with Sony Music that provided for a merger of Orchard with a Sony entity (the "Orchard/Sony Merger"). Sony Music's interest in Orchard dated back to November 2008, and Sony Music had contacted Orchard about a transaction on several occasions.

Stein testified in the appraisal trial that he began discussing a potential transaction with Sony Music between the "beginning of 2011" and the "summer of 2011." *Orchard*, C.A. No. 5713–CS, at 243–45 (Del. Ch. Apr. 22, 1012) (TRANSCRIPT). Those discussions evolved into the Orchard/Sony Merger. The discussions thus

started a matter of months after the squeeze-out closed on July 29, 2010.

## M. The Appraisal Proceeding And This Litigation

After the merger closed, certain Orchard stockholders pursued an appraisal. In 2012, Chief Justice Strine, then Chancellor, ruled that the fair value of Orchard's common stock at the time of the merger was $4.67 per share. Two months later, and over two years after the merger closed, the plaintiffs filed this breach of fiduciary duty action.

## II. LEGAL ANALYSIS

Under Court of Chancery Rule 56, summary judgment "shall be rendered forthwith" if "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Ct. Ch. R. 56(c). The moving party bears the initial burden of demonstrating that even with the evidence construed in the light most favorable to the non-moving party there are no genuine issues of material fact. *Brown v. Ocean Drilling & Exploration Co.*, 403 A.2d 1114, 1115 (Del. 1979). If the moving party meets this burden, then to avoid summary judgment the non-moving party must "adduce some evidence of a dispute of material fact." *Metcap Sec. LLC v. Pearl Senior Care, Inc.*, 2009 WL 513756, at *3 (Del.Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 899 (Del.2009) (TABLE); *accord Brzoska v. Olson*, 668 A.2d 1355, 1364 (Del.1995).

[T]he function of the judge in passing on a motion for summary judgment is not to weigh evidence and to accept that which seems to him to have the greater weight. His function is rather to determine whether or not there is any evi-

dence supporting a favorable conclusion to the nonmoving party. When that is the state of the record, it is improper to grant summary judgment.

*Cont'l Oil Co. v. Pauley Petroleum, Inc.*, 251 A.2d 824, 826 (Del.1969).

"There is no 'right' to a summary judgment." *Telxon Corp. v. Meyerson*, 802 A.2d 257, 262 (Del.2002). When confronted with a Rule 56 motion, the court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the facts presented that it is desirable to inquire into or develop the facts more thoroughly at trial in order to clarify the law or its application.[1]

■ The parties' motions must be evaluated individually. "[C]ross-motions for summary judgment are not the procedural equivalent of a stipulation for a decision on a 'paper record.'" *Empire of Am. Relocation Servs., Inc. v. Commercial Credit Co.*, 551 A.2d 433, 435 (Del.1988). Court of Chancery Rule 56(h) permits the court to deem cross motions "to be the equivalent of a stipulation for decision on the merits based on the record submitted with the motions," but only if the parties "have not presented argument to the Court that there is an issue of fact material to the disposition of either motion." In this case, each side has opposed the other's motion by arguing that genuine issues of material fact preclude entry of summary judgment.

## A. The Claimed Disclosure Violations

■ The plaintiffs seek a summary judgment determination that certain disclosures in the Proxy Statement were materially false or misleading. When directors submit to the stockholders a transaction that requires stockholder ap-

1. *See, e.g., Alexander Indus., Inc. v. Hill*, 211 A.2d 917, 918–19 (Del.1965); *Ebersole v. Lowengrub*, 180 A.2d 467, 468–69 (Del.1962); *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 1998 WL 731660, at *3 (Del.Ch. Oct. 9, 1998).

proval (such as a merger, sale of assets, or charter amendment) or which requires a stockholder investment decision (such as tendering shares or making an appraisal election), "[t]he directors of a Delaware corporation are required to disclose fully and fairly all material information within the board's control." *Malone v. Brincat*, 722 A.2d 5, 12 (Del.1998). A fact is material "if there is a substantial likelihood that a reasonable shareholder would consider it important in deciding how to vote." *Rosenblatt v. Getty Oil Co.*, 493 A.2d 929, 944 (Del.1985) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976)). The inquiry does not require "a substantial likelihood that [the] disclosure ... would have caused the reasonable investor to change his vote." *Id.* (quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126). The question is rather whether there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* (quoting *TSC Indus.*, 426 U.S. at 449, 96 S.Ct. 2126). "Whether disclosures are adequate is a mixed question of law and fact." *Zirn v. VLI Corp.*, 621 A.2d 773, 777 (Del. 1993).

### 1. Whether The Merger Triggered The Liquidation Preference

■ The plaintiffs contend that the Proxy Statement misstated whether the merger triggered the Series A liquidation preference. Chief Justice Strine, then Chancellor, held in the appraisal decision that the merger did not trigger the liquidation preference. *Orchard*, 2012 WL 2923305, at *8. There are four places where the Proxy Statement addresses whether the merger would trigger the preference. In two places, the Proxy Statement got the analysis right. In the other two, the Proxy Statement got it wrong. Unfortunately for the defendants, one of the erroneous disclosures appears in the Notice of Meeting as part of an item required by the Delaware General Corporation Law (the "DGCL"). That erroneous disclosure was material as a matter of law.

When stockholders opened the Proxy Statement, the first thing they saw was a letter from Donahue, writing in his capacity as Chair of the Special Committee and Chairman of the Board. The letter explained that at the upcoming annual meeting, stockholders would be asked to vote on the merger. It then stated: "In addition, you are being asked at the annual meeting ... to approve an amendment to the Certificate of Designations of our Series A convertible preferred stock, necessary to permit the transactions contemplated by the merger agreement to be effected...." Proxy Statement, Letter to Stockholders at 1. That was accurate. But for the Block Amendment, the Change of Control Block prevented Orchard from being a party to the squeeze-out.

The next item stockholders saw was the Notice of Stockholder Meeting. Item 1 of the notice described the merger. Item 2 of the notice described the Block Amendment. The full text of item 2 stated:

> To approve an amendment to the Certificate of Designations of the Series A convertible preferred stock (the "Certificate Amendment Proposal") that would permit The Orchard to consummate the merger as contemplated by the merger agreement, *without which amendment the merger consideration that our common stockholders would otherwise receive in the merger would be required to be allocated first to holders of our Series A convertible preferred stock, primarily Dimensional Associates, to satisfy their right to a liquidation pref-*

*erence.* The Certificate Amendment Proposal is conditioned upon and subject to the approval of the Merger Proposal. If the Merger Proposal is not adopted, the Certificate Amendment Proposal will not be presented at the meeting.

Proxy Statement, Notice at 1 (emphasis added). The non-italicized portion was accurate. The italicized portion was inaccurate. Had the italicized portion been deleted, the remaining text would have been accurate. But the italicized language appeared in the notice, and it stated inaccurately that without the Block Amendment, the Series A would receive its liquidation preference in the merger. That was wrong. The merger did not trigger the Series A liquidation preference under any circumstances.

The Proxy Statement made a similar error when describing Fesnak's financial analyses. After noting that Fesnak deducted the full amount of the Series A liquidation preference, the Proxy Statement said:

> In certain standard corporate events, The Orchard has a contractual obligation to pay the holders of its series A convertible preferred stock its liquidation preference prior to any payments to the holders of our common stock. *Although this payment will be made inapplicable in connection with the proposed merger,* The Orchard's contractual obligation to pay this liquidation preference is ongoing and will remain a liability after the consummation of the proposed merger. When calculating the value of the common equity of The Orchard … this ongoing liability must be accounted for.

Proxy Statement at 31 (emphasis added). This was the same mistake that appeared in the notice. The Block Amendment did not make the Series A's liquidation preference "inapplicable." The Series A's liqui-

dation preference was never "applicable" because the merger did not trigger it in the first place.

The Proxy Statement then got the analysis right again in a section specifically devoted to the Block Amendment. *See id.* at 90. In this section, the Proxy Statement set forth the complete text of the Block Amendment and accurately described what it would accomplish: giving the holders of a majority of the Series A the ability to "consent to the non-application of [the provision]." *Id.* The Proxy Statement also accurately stated the purpose of the amendment, which was to permit the merger to take place: "In the judgment of our board of directors, the amendment to the Series A convertible preferred stock Certificate of Designations is necessary and desirable because it is necessary for the merger and the other transactions contemplated by the merger agreement to proceed." *Id.*

The defendants contend that the two accurate descriptions were sufficient to provide an adequate total mix of information. This decision need not wrestle with that issue, because the plaintiffs correctly argue that the incorrect description in the notice of meeting was material as a matter of law.

Section 242(b)(1) of the DGCL states that when a corporation with capital stock wishes to amend its certificate of incorporation,

> its board of directors shall adopt a resolution setting forth the amendment proposed, declaring its advisability, and either calling a special meeting of the stockholders entitled to vote in respect thereof for the consideration of such amendment or directing that the amendment proposed be considered at the next annual meeting of the stockholders. Such special or annual meeting shall be called and held upon notice in accor-

dance with § 222 of this title. *The notice shall set forth such amendment in full or a brief summary of the changes to be effected thereby.*

8 *Del. C.* § 242(b)(1) (emphasis added).[2] The DGCL does not require that stockholders receive many items of information, but those that it does require are material *per se.*[3]

Item 2 of the notice of meeting provided "a brief summary of the changes to be effected" by the Block Amendment, and that brief summary was inaccurate. Summary judgment is granted in favor of the plaintiffs holding that the inaccuracy was material as a matter of law.

## 2. The Description Of Fesnak's Valuation Methodology

■ Separate and apart from the question of whether the merger would trigger the Series A's liquidation preference, the plaintiffs take issue with the Proxy Statement's description of (i) the Series A liquidation preference as an on-going obligation of the Company and (ii) how Fesnak valued it. The former disclosure was correct, but the latter disclosures raise fact issues that cannot be resolved on summary judgment.

The plaintiffs claim that the Proxy Statement inaccurately described the Series A liquidation preference as a continuing obligation. They again point to a paragraph that appears in the section of the Proxy Statement describing Fesnak's valuation methods. To repeat, the problematic paragraph states:

> In certain standard corporate events, The Orchard has a contractual obligation to pay the holders of its series A convertible preferred stock its liquidation preference prior to any payments to the holders of our common stock. Although this payment will be made inapplicable in connection with the proposed merger, The Orchard's contractual obligation to pay this liquidation preference is ongoing and will remain a liability after the consummation of the proposed merger. When calculating the value of the common equity of The Orchard … this ongoing liability must be accounted for.

with a charter amendment conditioned on the approval of the merger. This decision has therefore analyzed plaintiffs' argument under the notice requirement of Section 242(b)(1), rather than Section 251(c). The underlying theory of liability—an incorrect item of statutorily required information—is the same.

**2.** The plaintiffs framed their argument in terms of Section 251(c) of the DGCL, which requires that a constituent corporation in a merger whose stockholders will vote on the merger agreement at a meeting of stockholders send a notice of meeting "to each holder of stock, whether voting or nonvoting, of the corporation … at least 20 days prior to the date of the meeting." 8 *Del. C.* § 251(c). Under Section 251(c), "[t]he notice shall contain a copy of the agreement or a brief summary thereof." *Id.* Pursuant to Section 251(b), an agreement of merger or consolidation may state "such amendments or changes in the certificate of incorporation of the surviving corporation as are desired to be effected by the merger." 8 *Del. C.* § 251(b)(3). In advancing the Block Amendment, Orchard did not propose an amendment under Section 251(b) that would become effective upon the closing of the merger such that the notice requirement of Section 251(c) would apply. Orchard proceeded under Section 242(b)(1)

**3.** *See Nebel v. Southwest Bancorp, Inc.,* 1995 WL 405750, at *6 (Del.Ch. July 5, 1995) (statutory mandate to distribute copy of appraisal statute); *Jackson v. Turnbull,* 1994 WL 174668, at *5–6 (Del.Ch. Feb. 8, 1994) (statutory mandate to provide copies of merger agreement and to describe accurately time periods for exercise of appraisal rights); *see also Berger v. Pubco Corp.,* 976 A.2d 132, 135–36, 142 (Del.2009) (affirming portion of Court of Chancery opinion holding that failure to provide information mandated by appraisal statute constituted material disclosure violation).

Proxy Statement at 31. According to the plaintiffs, this statement was inaccurate because the liquidation preference was not triggered by the merger.

Contrary to the plaintiffs' position, the statement that the liquidation preference remained a "contractual obligation" payable under certain circumstances was accurate. It was precisely because the merger did not trigger the Series A's liquidation preference that the preference remained an on-going obligation of the Company. The first sentence of the challenged statement is therefore correct. The plaintiffs' motion for summary judgment on this issue is denied.

■ What was and remains open to debate was the degree to which the liquidation preference was triggered by "standard corporate events" and the manner in which it had to be "accounted for." *Id.* Unlike many preferred stock liquidation preferences, the Series A's liquidation preference only would be paid upon an actual liquidation, dissolution, or winding up of the Company. Although many certificates of designations define those terms broadly, the Orchard certificate left them to their narrower meanings under the DGCL.[4] As the appraisal decision explained, the narrower meanings meant that whether the Series A ever would receive its liquidation preference was highly speculative:

> Whether the liquidation preference would ever be triggered in the future was entirely a matter of speculation as of the Merger date, because that turned on whether one of the events triggering it under the Certificate of Designations would occur. Unlike a situation where a preference becomes a put right by con-

tract at a certain date, the liquidation preference here was only triggered by unpredictable events such as a third-party merger, dissolution, or liquidation. *Orchard,* 2012 WL 2923305, at *1 (footnote omitted). At the time of the merger, therefore, "the possibility that any of the triggering events would have occurred at all, much less in what specific time frame, was entirely a matter of speculation." *Id.* at *6.

In the appraisal decision, Chief Justice Strine, then Chancellor, held that the possibility of an event that would trigger the liquidation preference was far too speculative to be used to value the Series A. *Id.* at *6–7. As a separate and independent basis for not using the liquidation preference to value the Series A, Chief Justice Strine noted that Delaware appraisal law requires that a corporation be valued as a going concern and not using liquidation value. *Id.* at *7. Delaware appraisal law therefore precluded using the liquidation preference to value the Series A, because it would be "tantamount to valuing the company on a liquidation basis or presuming a sale of the company, because it is only in those circumstances that the preference would be triggered." *Id.* at *8.

■ When rendering its fairness opinion, Fesnak valued the Series A using the face amount of the liquidation preference. In doing so, Fesnak departed from its earlier methodology of valuing the Series A on an as-converted basis. To the extent that the Proxy Statement accurately describes what Fesnak did, however debatable the method might have been, the description does not give rise to a disclosure violation. A plaintiff cannot create a dis-

4. *See, e.g.,* 8 *Del. C.* § 275 (describing procedures for dissolution generally), *id.* § 278 (addressing continuation of corporation after dissolution for purposes of suit and winding up affairs), *id.* §§ 280–281 (addressing mechanisms for dissolved corporation to make payments and distributions to claimants).

closure violation by disagreeing with the valuation method that the financial advisor used. *See, e.g., In re Atheros Commc'ns, Inc. S'holder Litig.*, 2011 WL 864928, at *10 (Del.Ch. Mar. 4, 2011) (explaining that a disagreement with the substance of a financial advisor's work does not give rise to a disclosure claim); *In re PNB Hldg. Co. S'holders Litig.*, 2006 WL 2403999, at *19–20 (Del.Ch. Aug. 18, 2006) (holding that a claim that the "valuation methodology" used by the financial advisor was "legally improper," albeit accurately disclosed, did not state a disclosure claim).

In this case, however, the plaintiffs have done more than disagree with Fesnak's methodology. In contrast to the Proxy Statement and the defendants' briefs, which assert that Fesnak determined independently as a matter of prudent valuation judgment to value the Series A using the full face value of its liquidation preference, the plaintiffs contend that Fesnak changed its valuation method because the Special Committee said so. In support of their position, the plaintiffs rely on Robert Fesnak's trial testimony in the appraisal action, on a letter from Donahue providing Fesnak with the value of the liquidation preference, and on the language of Fesnak's fairness opinion, which disclaims making any independent attempt to value the Series A. This evidence is sufficient to create an issue of fact as to what Fesnak actually did. If Fesnak simply followed instructions, rather than using its own independent judgment, then the Proxy Statement is inaccurate. That determination cannot be made on a motion for summary judgment. The plaintiffs' motion for summary judgment on this issue is denied.

### 3. Donahue's Relationship With Dimensional And Expectation Of Future Employment

 The plaintiffs next argue that the Proxy Statement misleadingly disclosed that Donahue "had no financial or other relationship with Dimensional" or "any prior or other relationships with Dimensional" other than his service as a director of Orchard. Proxy Statement at 12–13. The plaintiffs have cited evidence that Donahue had a long-standing personal and business relationship of almost 20 years with Jeff Samberg, a Dimensional investor and the brother of Joseph Samberg, who controls Dimensional. The relationship included making co-investments in a venture capital fund and at least four other companies. The plaintiffs cite evidence that Donahue has known Arthur Samberg—Jeff Samberg's father—and Joseph Samberg socially since 2000 and 2001, respectively. The plaintiffs also have cited evidence that before the merger closed, Donahue solicited a post-closing consulting engagement with Dimensional. In support, the plaintiffs have cited an email from Donahue to Navin that can be construed at this procedural stage as offering to provide consulting services. The plaintiffs also cite post-merger documents that can be construed at this procedural stage as examples of Donahue providing consulting advice. In October 2010, Donahue began working as a paid consultant. The defendants belittle this evidence and contend that it is not sufficient as a matter of law.

In controller transactions, the "effective functioning of the Special Committee as an informed and aggressive negotiating force is of obvious importance to the public stockholders." *Clements v. Rogers*, 790 A.2d 1222, 1242 (Del.Ch.2001) (footnote omitted). Where "omitted information goes to the independence or disinterest of directors who are identified as the company's 'independent' or 'not interested' directors, the 'relevant inquiry is not whether an actual conflict of interest exists, but rather whether full disclosure of potential conflicts of interest has been made.'" *Mil-*

lenco L.P. v. meVC Draper Fisher Jurvetson Fund I, Inc., 824 A.2d 11, 15 (Del.Ch. 2002) (quoting Wilson v. Great Am. Indus., Inc., 855 F.2d 987, 994 (2d Cir.1988)). This court has held that special committee members' "prior … relationships" with a controller "should have been disclosed" because of the committee's "role as negotiators on behalf of the minority stockholders." In re Emerging Commc'ns, Inc. S'holders Litig., 2004 WL 1305745, at *37 (Del.Ch. June 4, 2004). A sufficiently close relationship between Donahue and the Samberg family could render him unfit to have served as a member of the Special Committee, much less as its Chair. In re Loral Space & Commc'ns Inc., 2008 WL 4293781, at *20–21 (Del.Ch. Sept. 19, 2008) (treating special committee chairman as conflicted because of his long-standing relationship with controller and his solicitation of an investment from the controller during the special committee negotiations).

Directors must also avoid misleading partial disclosures. Once directors begin to speak on a subject, they assume an " 'obligation to provide the stockholders with an accurate, full, and fair characterization.' " Zirn v. VLI Corp., 681 A.2d 1050, 1056 (Del.1996) (quoting Arnold v. Soc'y for Sav. Bancorp, Inc. (Arnold II), 650 A.2d 1270, 1280 (Del.1994)). Additional disclosure may be required if "the omission of a related fact renders the partially disclosed information materially misleading." Id. at 1057.

At this stage of the case, in the context of a controller squeeze-out, it is not possible to rule as a matter of law on the materiality or completeness of the disclosures about Donahue. The plaintiffs have cited evidence which, if credited, could lead to findings of fact that would render the disclosures about Donahue incorrect or, alternatively, cause them to be viewed as misleading partial disclosures. The defendants have pointed to evidence which, if construed in their favor, could result in findings of fact that would lead to the disclosures being accurate. These matters create issues of fact that only can be resolved through a trial. The plaintiffs' summary judgment motion regarding these disclosures is denied.

### 4. Dimensional's Negotiations With Roy

The plaintiffs next argue that the Proxy Statement contains a materially false and misleading account of Dimensional's negotiations with Roy. The Proxy Statement frames its description in terms of a report that the Special Committee received from Dimensional:

The special committee was advised by Mr. Stein as follows: On December 10, 2009, Mr. Stein received from [Roy] a preliminary summary of the terms of a proposed transaction involving the acquisition by an investor group led by [Roy] of all of the shares of [the Series A]. … Later that day, Mr. Stein received a call from [Roy], during which the terms of the proposed transaction … were discussed. After an extensive discussion of [Roy's] proposal, Mr. Stein informed [Roy] that [his] proposal was not acceptable to Dimensional … due to the fact that (1) it did not contemplate a purchase by [Roy] of [the Series A] at their full liquidation value and (2) the consideration offered by [Roy] was a combination of cash, a promissory note and equity interests in the surviving entity, which, given the fact that [Roy's] proposal was conditioned upon … financing …, [meant that] acceptance … of [Roy's] proposal would involve … unacceptable additional completion and investment risk.

Proxy Statement at 18. According to the Proxy Statement, Stein made the same

report to the Special Committee during a meeting on December 11, 2009. *Id.*

The Proxy Statement also describes the letter the Special Committee received from Roy withdrawing his proposal:

On December 11, 2009, the special committee received a letter from [Roy] withdrawing [his] proposal.... According to the letter, ... Dimensional ... rejected [Roy's] bid and made a counteroffer. According to the letter, [Roy] rejected the counteroffer by Dimensional ... because it was "neither economically viable nor with solid financial justification."

*Id.*

The plaintiffs argue that these descriptions are false and misleading, because in his December 11, 2009 letter to the Special Committee, Roy explained that he had offered to buy Dimensional's preferred stock for $32 million, representing a $7 million premium to the $25 million liquidation preference. Neither the report of the call from Stein, nor the description of Roy's letter mentions this fact, leaving the impression that Stein accurately described Roy's offer as failing to contemplate a purchase of the Series A at full liquidation value. The plaintiffs point out that according to Roy's communications, Dimensional did not insist on face value, but rather demanded a premium over the liquidation preference. Roy stated that Dimensional first demanded a price for its Series A equal to the liquidation preference ($25 million) multiplied by the same premium that Roy would pay common stockholders. Dimensional subsequently demanded that Roy pay $40 million for the Series A, with $20 million due at closing and another $20 million over the next five years. The defendants contest the sufficiency of the plaintiffs' evidence. They rely primarily on Stein, who not surprisingly testified consistently with the Proxy Statement's account.

If the plaintiffs prove at trial that their view of the facts is accurate, then the disclosures regarding the negotiations with Roy are materially misleading. *See Arnold II*, 650 A.2d at 1280–81. *Arnold* holds that the omission of key information about a competing bid is material—even if the bid is "highly speculative and contingent"—where a proxy statement contains partial and incomplete disclosures about the bidding history. *Id.* at 1280. If the plaintiffs' account is true, then Dimensional's demand for a premium over the $25 million liquidation preference value is material as "evidence of unfair dealing." *Kahn v. Dairy Mart Convenience Stores, Inc.*, 1996 WL 159628, at *8 (Del.Ch. Mar. 29, 1996). The Proxy Statement repeatedly cites Dimensional's statements about its willingness to sell to a third party who offered to pay the Series A's liquidation preference, and the Proxy Statement references this fact as evidence of the merger's fairness. The Proxy Statement also depicts the Special Committee as relying on the accuracy of Dimensional's representations when making decisions about issues such as whether to refer third party bidders to Dimensional, the credibility of third party offers, the significance of the absence of third party bids, and the effectiveness of the go-shop. If Dimensional actually was not willing to sell its position and misrepresented that fact to the Special Committee, then that information would undermine the entire process and be material to minority stockholders.

Whether the Proxy Statement accurately portrays Dimensionals negotiations with Roy cannot be decided on summary judgment. The factual conflicts require a trial. The same is true for the descriptions of Dimensionals negotiations with other bidders, such as Bidder C. The plaintiffs motion for summary judgment is denied as to these issues.

## B. The Standard Of Review

The plaintiffs have moved for summary judgment declaring that entire fairness is the operative standard of review for trial. The defendants seek a determination that the business judgment rule is the proper standard of review. If entire fairness applies, the defendants contend that the plaintiff has the burden to prove unfairness. The plaintiffs' motion for summary judgment on this issue is granted.

"When a transaction involving self-dealing by a controlling shareholder is challenged, the applicable standard of judicial review is entire fairness, with the defendants having the burden of persuasion." *Ams. Mining Corp. v. Theriault,* 51 A.3d 1213, 1239 (Del.2012). "[T]he defendants bear the burden of proving that the transaction with the controlling stockholder was entirely fair to the minority stockholders." *Id.* The defendants may seek to lower the standard of review from entire fairness by showing that the controller did not stand on both sides of the transaction. One means of accomplishing this is by using procedural devices such as (i) the creation of a sufficiently authorized board committee composed of independent and disinterested directors or (ii) the conditioning of the transaction on the affirmative vote of a majority of the shares owned by stockholders who are not affiliated with the controller.

If a controller agrees up front, before any negotiations begin, that the controller will not proceed with the proposed transaction without both (i) the affirmative recommendation of a sufficiently authorized board committee composed of independent and disinterested directors and (ii) the affirmative vote of a majority of the shares owned by stockholders who are not affiliated with the controller, then the controller has sufficiently disabled itself such that it no longer stands on both sides of the transaction, thereby making the business judgment rule the operative standard of review. *In re MFW S'holders Litig.,* 67 A.3d 496, 502–03 (Del.Ch.2013), *appeal docketed,* No. 334, 2013 (Del. June 25, 2013). If a controller agrees to use only one of the protections, or does not agree to both protections up front, then the most that the controller can achieve is a shift in the burden of proof such that the plaintiff challenging the transaction must prove unfairness. *Ams. Mining,* 51 A.3d at 1240.

"When the standard of review is entire fairness, *ab initio,* director defendants can move for summary judgment on either the issue of entire fairness or the issue of burden shifting." *Emerald P'rs v. Berlin (Emerald II),* 787 A.2d 85, 98–99 (Del.2001). "[I]f the record does not permit a pretrial determination that the defendants are entitled to a burden shift, the burden of persuasion will remain with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction." *Ams. Mining,* 51 A.3d at 1243. By parity of reasoning, if the record does not permit a pretrial determination that the controller disabled itself sufficiently to restore the business judgment rule, then the standard of review will remain entire fairness.

The controlling stockholder in this case, Dimensional, did not agree up front, before any negotiations began, that it would not proceed with a self-dealing transaction without both (i) the affirmative recommendation of a sufficiently authorized board committee composed of independent and disinterested directors and (ii) the affirmative vote of a majority of the shares owned by stockholders who are not affiliated with the controller. Entire fairness is therefore the operative standard of review.

■ The majority-of-the-minority vote to which Dimensional eventually agreed is not sufficient to obtain a pre-trial determination shifting the burden of proof because Dimensional has not established as a matter of law that the vote was fully informed. The disclosures contained one incorrect statement that was material as a matter of law. The evidence at trial may show that other disclosures were materially false or misleading.

■ The use of a special committee is also not sufficient to obtain a pre-trial determination shifting the burden of proof. At a minimum, to obtain burden shifting, the members of the committee must be disinterested and independent. *MFW*, 67 A.3d at 509. Importantly, unlike a typical pleadings-stage challenge to director independence or disinterestedness where the burden rests on the plaintiff to plead facts sufficient to rebut the presumptions of the business judgment rule, the defendants are seeking a pre-trial determination on the standard of review via motion for summary judgment. They therefore have assumed the burden of showing the absence of any genuine issue of material fact as to the directors' independence or disinterestedness. *See Emerald II*, 787 A.2d at 92–93; *Emerald P'rs v. Berlin (Emerald I)*, 726 A.2d 1215, 1222 (Del.1999). Under this standard, there is no genuine issue of material fact as to the independence or disinterestedness of Altschul, Dinh, Peck, or Straka, but the plaintiffs have raised factual disputes about the independence of Donahue.

■ When determining whether a financial interest, personal relationship, or other alleged conflict compromises the disinterestedness and independence of an outside director, the court must determine whether the alleged conflict is material. The simple fact that the director has some financial ties or personal relationships is not sufficient. "Rather, the question is whether those ties are *material*, in the sense that the alleged ties could have affected the impartiality of the director."[5]

> Even in the context of personal, rather than financial, relationships, the materiality requirement does not mean that the test cannot be met. For example, it is sometimes blithely written that "mere allegations of personal friendship" do not cut it. More properly, this statement would read "mere allegations of mere friendship" do not qualify. If the friendship was one where the parties had served as each other's maids of honor, had been each other's college roommates, shared a beach house with their families each summer for a decade, and are as thick as blood relations, that context would be different from parties who occasionally had dinner over the years, go to some of the same parties and gatherings annually, and call themselves "friends."

*MFW*, 67 A.3d at 509 n. 37 (citation omitted).

The plaintiffs have pointed to past business and social connections between Donahue and the Samberg family which, if

---

**5.** *MFW*, 67 A.3d at 509–10 (footnote omitted); *accord Grimes v. Donald*, 673 A.2d 1207, 1216 (Del.1996) (stating that to rebut the business judgment rule for purposes of demand futility a stockholder must show that "a majority of the board has a material financial or familial interest"), *overruled on other grounds by Brehm v. Eisner*, 746 A.2d 244 (Del.2000); *Cinerama, Inc. v. Technicolor, Inc. (Technicol-* *or Plenary IV)*, 663 A.2d 1156, 1167 (Del. 1995) (explaining that to rebut the business judgment rule, "a shareholder plaintiff [must] show the materiality of a director's self-interest" (internal quotation marks omitted)); *Cede & Co. v. Technicolor, Inc. (Technicolor Plenary II)*, 634 A.2d 345, 363 (Del.1993) (same).

viewed in isolation, would not be sufficient to raise a triable issue about his independence. When considered together with the evidence concerning Donahue's consulting work for Dimensional regarding Orchard after the closing of the transaction, the picture takes on a grayer hue. The potential materiality of Donahue's relationships with the Samberg family and Dimensional becomes even more significant because of the leading role that Donahue played in the process. He chaired the Special Committee, served as the Committee's principal negotiator, and acted as the central conduit for the flow of information to and from the Committee. Evidencing his greater responsibilities, he received compensation of $80,000 for serving as Chair of the Special Committee and the CEO search committee. Other directors who served as members of both committees received only $15,000. The factual record could support a finding at trial that Donahue was the committee's most influential figure, making his independence and disinterestedness all the more important.[6] Under the circumstances, the facts surrounding Donahue's relationships with the Samberg family and Dimensional should be determined at trial, rather than through summary judgment. *See Mentor Graphics*, 1998 WL 731660, at *3 ("[T]his Court may, in its discretion, deny summary judgment if it decides upon a preliminary examination of the presented facts that it is desirable to inquire into or develop more thoroughly the facts at trial in order to clarify the law or its application.").

When a controller has not disabled its influence at both the board and stockholder levels up front, before the negotiations start, a reviewing court will examine the effectiveness of the special committee's work when determining if burden-shifting is warranted. *See MFW*, 67 A.3d at 528. "To obtain the benefit of burden shifting, the controlling shareholder must do more than establish a perfunctory special committee of outside directors." *Tremont II*, 694 A.2d at 429. "Rather, the committee must function in a manner which indicates that the controlling shareholder did not dictate the terms of the transaction and that the committee exercised real bargaining power at an arms-length." *Id.* (internal quotation marks omitted).

On this issue, the plaintiffs have responded to the defendants' motion for summary judgment by raising a factual dispute about whether Dimensional misled the Special Committee about its willingness to sell Orchard to a third party. "Generally in order to make a special committee structure work it is necessary that a controlling shareholder disclose fully all the material facts and circumstances surrounding the transaction." *Kahn v. Tremont Corp. (Tremont I)*, 1996 WL 145452, at *15 (Del.Ch. Mar. 21, 1996) (Allen, C.) (internal quotation marks omitted).[7]

---

**6.** *See, e.g., Kahn v. Tremont Corp. (Tremont II)*, 694 A.2d 422, 426, 429–30 (Del.1997) (emphasizing conflicts of special committee chair to whom other members deferred); *Loral Space*, 2008 WL 4293781, at *22 (emphasizing the Special Committee Chairman's relationships with the controlling stockholder in connection with transaction in which the controller acquired an equity stake in the corporation in exchange for capital infusion and finding that these relationships "were too substantial to make him a fit member of the Special Committee, much less Chairman"); *see also Emerging Commc'ns*, 2004 WL 1305745, at *35 & n. 162, *37 (observing that the past and present associations of "the only arguably independent Committee member" raised questions as to his independence and noting that the "prior consulting relationships of [a Committee member] should have been disclosed" because of his "role as [a] negotiator[ ]" on behalf of the minority stockholders").

**7.** In *Tremont I*, Chancellor Allen held that the special committee functioned effectively and shifted to the plaintiffs the burden to prove that the transaction price was unfair. *Id.* at

There are certain categories of negotiating information that the controlling stockholder need not share, such as "information disclosing the top price that a proposed buyer would be willing or able to pay, or the lowest price that a proposed seller would accept." *Tremont I*, 1996 WL 145452, at *15; *accord In re Pure Res., Inc., S'holders Litig.*, 808 A.2d 421, 451 (Del.Ch.2002). Categories of information that the controller must disclose include:

1) . . . all of the material terms of the proposed transaction;

2) . . . all material facts relating to the use or value of the assets in question to the beneficiary itself. Such facts would include alternative uses for assets or "hidden value" (*e.g.*, there is oil under the land subject to sales negotiation);

3) . . . all material facts which it knows relating to the market value of the subject matter of the proposed transaction. Such facts would include for example . . . forthcoming changes in legal regulation or technological changes that would affect the value of the asset in question either to the subsidiary or to others.

*Tremont I*, 1996 WL 145452, at *16 (footnotes omitted). Chancellor Allen intended for these categories "to include all *material information known to the fiduciary except that information that relates only to its consideration of the price at which it will buy or sell and how it would finance a purchase or invest the proceeds of a sale.*" *Id.*

 According to the Proxy Statement and the defendants' briefs, Dimensional assured the Special Committee on multiple occasions that it would sell Orchard to a third party that paid Dimensional the Series A liquidation preference. That was highly material information. Based on these assurances, the Special Committee routed third party inquiries to Dimensional rather than taking charge of the negotiations itself. Because of Dimensional's representations, the Special Committee had no reason to consider possible measures to counterbalance Dimensional's influence or prevent Dimensional from taking actions contrary to the best interests of the stockholders as a whole.[8] Ultimately,

*1. On appeal, the Delaware Supreme Court held that the special committee had not functioned effectively and reversed for a new determination of fairness with the burden properly assigned. *Tremont II*, 694 A.2d at 430. The Delaware Supreme Court did not reverse any of the Chancellor's legal rulings, although it did disagree with the use of the term "privileged" to describe information that a controller can withhold during a negotiation. *Id.* at 432. This decision cites aspects of *Tremont I* that were not reversed on appeal. In light of this disclosure, citations to *Tremont I* omit the cumbersome *"rev'd on other grounds."*

8. "Equity will protect a controlling stockholder against the dilution of its position when a board acts for an improper purpose, such as entrenchment, that is adverse to the interests of the entity and all of its stockholders," but a board does not have a duty to serve the interests of the controller. *Klaassen v. Allegro Dev. Corp.*, 2013 WL 5967028, at *11 (Del.Ch. Nov.

7, 2013), *aff'd*, No. 583, 2013, 2013 WL 6798468 (Del. Dec. 20, 2013); *accord Mendel v. Carroll*, 651 A.2d 297, 304 (Del.Ch.1994) (Allen, C.) (discussing *Condec Corp. v. Lunkenheimer Co.*, 230 A.2d 769 (Del.Ch.1967) and *Can. S. Oils, Ltd. v. Manabi Exploration Co.*, 96 A.2d 810 (Del.Ch.1953)); *Phillips v. Insituform of N. Am., Inc.*, 1987 WL 16285, at *8 (Del.Ch. Aug. 27, 1987) (Allen, C.) (same). A board acting loyally may take action to oppose, constrain, or even dilute a large or controlling stockholder. *See, e.g., Hollinger Int'l, Inc. v. Black (Hollinger I)*, 844 A.2d 1022, 1088 (Del.Ch.2004) (Strine, V.C.) (approving board's deployment of rights plan to prevent controlling stockholder from selling block of shares to third party), *aff'd*, 872 A.2d 559 (Del.2005); *Mendel*, 651 A.2d at 306 ("I continue to hold open the possibility that a situation might arise in which a board could, consistently with its fiduciary duties, issue a dilutive option in order to protect the corporation or its minority shareholders from ex-

when negotiating the terms of the merger agreement, the Special Committee insisted on a go-shop, which only had value if Dimensional was willing to sell to a third party, and the Special Committee relied on the go-shop as validating the fairness of the price.

The plaintiffs have introduced evidence that creates a genuine issue of material fact as to whether Dimensional was willing to sell to a third party on commercially reasonable terms. If Dimensional actually was not willing to sell its stake and made a farce out of the third party inquiries and go-shop process, then it would not be possible for the Special Committee to rely on those factors as evidence of fairness. If Dimensional misled the Special Committee, then it will be virtually impossible for Dimensional to establish that the merger was entirely fair. At this procedural stage, the court cannot "weigh evidence and . . . accept that which seems . . . to have the greater weight." *Pauley Petroleum*, 251 A.2d at 826. A trial is required to determine the facts.

Leaving aside the question of Dimensional's intentions, the plaintiffs have pointed to evidence which raises litigable questions about the Special Committee's negotiation process. There is evidence that the Special Committee members received the CFO Memo and preliminary valuations from Fesnak that valued the Series A on an as-converted basis. According to Fesnak's testimony, for which there is some documentary support, the Special Committee decided to value the Series A using its full liquidation preference. That decision favored Dimensional and drove down the valuation of the common stock. The Special Committee members have testified that they did not instruct Fesnak to make this change and have cited countervailing evidence on fairness, but resolving those factual issues requires a trial.

Consequently, "the burden of persuasion will remain with the defendants throughout the trial to demonstrate the entire fairness of the interested transaction." *Ams. Mining*, 51 A.3d at 1243. This ruling does not mean that the use of a special committee and the eventual conditioning of the merger on a majority-of-the-minority vote are irrelevant. The Delaware Supreme Court "has repeatedly held that any board process is materially enhanced when the decision is attributable to independent directors." *Id.* (footnote omitted). "[J]udicial review for entire fairness of how the transaction was structured, negotiated, disclosed to the directors, and approved by the directors will be significantly influenced" by evidence relating to the func-

---

ploitation by a controlling shareholder who was in the process or threatening to violate his fiduciary duties to the corporation. . . ."); *Blasius Indus., Inc. v. Atlas Corp.*, 564 A.2d 651, 662 n. 5 (Del.Ch.1988) (suggesting hypothetical that could support dilutive action); *Phillips*, 1987 WL 16285, at *7 ("[*Unocal*] teaches that the powers of the board to deal with perceived threats to the corporation extend, in special circumstances, to threats posed by shareholders themselves and a board may, in such circumstances, take action to protect the corporation even if such action discriminates against and injures the shareholder or class of shareholders that poses a special threat."); *see also La. Mun.*

*Police Empls.' Ret. Sys. v. Fertitta*, 2009 WL 2263406, at *8 (Del.Ch. July 28, 2009) (declining to dismiss claim that board breached its fiduciary duties by failing to employ a rights plan to block a creeping acquisition by a large and arguably controlling stockholder when considered "together with other suspect conduct"). The recent M & A situation involving Quest Software provides an example of a special committee that took counter-balancing action against a CEO and large blockholder. *See In re Quest Software Inc. S'holders Litig.*, 2013 WL 5978900, at *2–4 (Del.Ch. Nov. 12, 2013) (summarizing special committee's actions during go-shop period as part of ruling on fee award).

tioning of the special committee and the disinterestedness and independence of its members. *Id.* at 1243–44. "Similarly, the issue of how stockholder approval was obtained will be significantly influenced" by evidence relating to the majority-of-the-minority vote. *Id.* at 1244. Evidence pertinent to the fair process aspect of the unitary entire fairness test in turn can affect the issue of fair price. *Id.* If the defendants prove at trial that one or both of these devices was effective, it will "significantly influence" the determination of fairness and any potential remedy.

## C. The Question Of Fairness

■ The plaintiffs seek a ruling as a matter of law that the merger was not entirely fair. According to the plaintiffs, the disclosure violations lead to the conclusion that the merger was not the result of a fair process, and the determination of fair value in the appraisal establishes that the merger did not provide a fair price. The defendants counter by seeking a determination as a matter of law that the merger was entirely fair. Fact issues preclude rendering either determination.

On the aspect of fair process, the lone disclosure issue on which the plaintiffs received summary judgment provides some evidence of unfairness. In *Weinberger*, the Delaware Supreme Court held that the

entire fairness standard requires compliance with the duty of disclosure and incorporated this principle into the fair dealing aspect of the test. *Weinberger v. UOP, Inc.*, 457 A.2d 701, 710 (Del.1983).[9] On the facts of the case, the *Weinberger* court held that "[m]aterial information, necessary to acquaint [the minority] shareholders with the bargaining positions of [the majority stockholder], was withheld under circumstances amounting to a breach of fiduciary duty." 457 A.2d at 703. The Supreme Court "therefore conclude[d] that this merger does not meet the test of fairness." *Id.* at 703; *accord Rabkin v. Philip A. Hunt Chem. Corp.*, 498 A.2d 1099, 1104 (Del.1985) ("[The] duty of fairness certainly incorporates the principle that a cash-out merger must be free of fraud or misrepresentation.").

■ At trial, however, a single disclosure problem may not be outcome-determinative. "[P]erfection is not possible, or expected as a condition precedent to a judicial determination of entire fairness."[10] Depending on the evidence as a whole, the defendants may be able to overcome this mistake. A finding of procedural fairness becomes more unlikely if the plaintiffs establish other disclosure violations, or if the plaintiffs demonstrate that Stein mischaracterized Dimensional's willingness to sell to third parties.

---

**9.** The *Weinberger* decision referred to the duty of disclosure as the "duty of candor." *Id.* at 711. The Delaware Supreme Court coined this phrase in *Lynch v. Vickers Energy Corp. (Vickers I)*, 383 A.2d 278, 279, 281 (Del.1977). Delaware decisions used it consistently until *Stroud v. Grace*, 606 A.2d 75 (Del.1992), when the Delaware Supreme Court criticized the term as potentially misleading. The *Stroud* court clarified that the duty of candor "represents nothing more than the well-recognized proposition that directors of Delaware corporations are under a fiduciary duty to disclose fully and fairly all material information within the board's control when it seeks shareholder action." *Id.* at 84. After *Stroud,* the prevail-

ing Delaware terminology shifted from the "duty of candor" to the "duty of disclosure."

**10.** *Technicolor Plenary IV*, 663 A.2d at 1179 (internal quotation marks omitted); *accord Emerald II*, 787 A.2d at 93 ("A determination that a transaction must be subjected to an entire fairness analysis is not an implication of liability."); *Nixon v. Blackwell*, 626 A.2d 1366, 1376 (Del.1993) ("Application of the entire fairness rule does not, however, always implicate liability of the conflicted corporate decisionmaker, nor does it necessarily render the decision void.").

On the aspect of fair price, the appraisal decision's holding that the fair value of Orchard was $4.67, more than two times the merger price of $2.05, is certainly evidence of financial unfairness. Delaware Supreme Court precedent establishes that the fair price and fair value standards call for equivalent economic inquiries.[11] They differ only in the appraisal statute's insistence on a point calculation when awarding fair value. *See* 8 *Del. C.* § 262(h).

At the same time, the fair price aspect of the entire fairness test is not itself a remedial calculation. The entire fairness test is a standard of review, and the fair process aspect of the unitary entire fairness test is flexible enough to accommodate the reality that "[t]he value of a corporation is not a point on a line, but a range of reasonable values." *Cede & Co. v. Technicolor, Inc. (Technicolor Appraisal III)*, 2003 WL 23700218, at *2 (Del.Ch. Dec. 31, 2003), *aff'd in part, rev'd in part on other grounds*, 884 A.2d 26 (Del.2005). When conducting a fair price inquiry as part of the entire fairness standard of review, the court asks whether the transaction was one "that a reasonable seller, under all of the circumstances, would regard as within a range of fair value; one that such a seller could reasonably accept."[12] A price may fall within the range of fairness for purposes of the entire fairness test even though the point calculation demanded by the appraisal statute yields an award in excess of the merger price. *Compare Technicolor Plenary IV*, 663 A.2d at 1176–77 (affirming that merger

---

**11.** *Weinberger*, 457 A.2d at 713–14 (equating fair price aspect of entire fairness with fair value standard in appraisal); *Sterling v. Mayflower Hotel Corp.*, 93 A.2d 107, 114 (Del. 1952) (adopting for entire fairness case the valuation standard for appraisal announced in *Tri–Continental v. Battye*, 74 A.2d 71 (Del. Supr.1950)); *accord Bershad v. Curtiss–Wright Corp.*, 535 A.2d 840, 845 (Del.1987) (explaining that fair price aspect of entire fairness standard "flow[s] from the statutory provisions ... designed to ensure fair value by an appraisal, 8 *Del. C.* § 262"); *Rosenblatt*, 493 A.2d at 940 (following *Sterling* ); *see, e.g., Del. Open MRI Radiology Assocs., P.A. v. Kessler*, 898 A.2d 290, 342–44 (Del.Ch.2006) (finding company's per-share value, then using that "as the basis for a conclusion that the merger was not financially fair to the squeezed-out minority ... as a matter of equity," and granting the same amount as damages); *Emerging Commc'ns*, 2004 WL 1305745, at *24 (finding that "fair value" was $38.05, stating that "[f]rom that fair value finding it further follows that the $10.25 per share merger price was not a 'fair price' within the meaning of the Delaware fiduciary duty case law beginning with *Weinberger*," and granting the difference as damages); *see also* John C. Coates IV, *"Fair Value" As an Avoidable Rule of Corporate Law: Minority Discounts in Conflict Transactions*, 147 U. Pa. L.Rev. 1251, 1261 (1999) ("In entire fairness cases, corporate fiduciaries are required to show that the terms of a proposed conflict transaction include a 'fair price,' and Delaware courts look to appraisal cases for guidance in deciding whether a given price is fair, even when a merger does not trigger appraisal rights."); Lawrence A. Hamermesh & Michael L. Wachter, *Rationalizing Appraisal Standards in Compulsory Buyouts*, 50 B.C. L.Rev. 1021, 1030 (2009) ("[I]t is generally accepted in the Delaware case law and the major treatises on Delaware corporate law that in evaluating the 'entire fairness' of a squeeze-out merger, the courts generally utilize the same valuation analysis for both the fair price prong of the fiduciary duty action and the appraisal action." (internal quotation marks omitted)); Guhan Subramanian, *Fixing Freezeouts*, 115 Yale L.J. 2, 43 (2005) ("As a starting point, courts in entire fairness proceedings generally look to the appraisal remedy....."). *See generally Reis v. Hazelett Strip–Casting Corp.*, 28 A.3d 442, 461–64 (Del.Ch. 2011) (discussing authorities).

**12.** *Cinerama, Inc. v. Technicolor, Inc. (Technicolor Plenary III)*, 663 A.2d 1134, 1143 (Del. Ch.1994) (Allen, C.), *aff'd*, 663 A.2d 1156 (Del.1995); *accord Tremont I*, 1996 WL 145452, at *1 ("A fair price is a price that is within a range that reasonable men and women with access to relevant information might accept.").

consideration of $23 per share was entirely fair), *with Cede & Co. v. Technicolor, Inc. (Technicolor Appraisal IV)*, 884 A.2d 26, 30 (Del.2005) (awarding fair value in appraisal of $28.41 per share).

The plaintiffs respond that even if the fair price aspect of entire fairness contemplates a range, the percentage difference between $2.05 and $4.67 is too big to accommodate. That argument has resonance, but finding unfairness as a matter of law is not a bridge that this judge, on the facts of this case, feels compelled to cross at this procedural stage. "The concept of fairness is of course not a technical concept. No litmus paper can be found or [G]eiger-counter invented that will make determinations of fairness objective." *Tremont I*, 1996 WL 145452, at *8. "This judgment concerning 'fairness' will inevitably constitute a judicial judgment that in some respects is reflective of subjective reactions to the facts of a case." *Technicolor Plenary III*, 663 A.2d at 1140. Depending on how they fair at trial, the defendants might prove that the merger as a whole was entirely fair. They might show that its terms were the product of arm's length bargaining comparable in vigor to what would occur between unaffiliated third parties and that, as often happens in rough-and-tumble world of commerce, one side (here, Dimensional) simply succeeded in extracting a good deal. If the only process failure was the error in the notice, the defendants might prevail. At this stage of the case, it is not possible to grant summary judgment on the issue of entire fairness to either the plaintiffs or the defendants.

Moreover, even if the defendants are unable to prove that the merger was entirely fair, the trial evidence necessarily will shape the court's view of the range of fairness, which will affect any remedial phase. The trial evidence also will have significance for assessing the potential liability of the various defendants, should that become necessary. There is accordingly no benefit to hazarding a legal conclusion on fairness at this procedural stage. This is rather one of those frequent situations where it is desirable to inquire into and develop more thoroughly the facts at trial.

## D. The Available Remedies

Both sides have moved for summary judgment on remedy issues. The plaintiffs have moved for summary judgment (i) awarding quasi-appraisal damages as a matter of law, (ii) awarding pre-judgment interest as a matter of law, and (iii) determining the liability of particular defendants as a matter of law. Because this decision has not decided the question of entire fairness, it is premature to determine what remedy would be imposed if the merger were found to have fallen short.

The defendants have moved for summary judgment claiming that regardless of whether the transaction is entirely fair, certain remedies cannot be awarded. The Special Committee members contend that they are exculpated from liability. Dimensional argues that two forms of damages— rescissory damages and quasi-appraisal— can be ruled out as a matter of law, and the Special Committee members join them on the issue of quasi-appraisal. The defendants' motions are denied.

### 1. The Section 102(b)(7) Defense

The Special Committee members seek summary judgment in their favor on the grounds that their conduct at most could have amounted to a breach of the duty of care and that they are exculpated from liability under Article VII, Section 1 of Orchard's certificate of incorporation (the "Exculpatory Clause"). The Exculpatory Clause states:

*Limitation of Liability.* To the fullest extent permitted by the General Corporation Law of the State of Delaware as the same exists or as may hereafter be amended, a director of the Corporation shall not be personally liable to the Corporation or its stockholders for monetary damages for breach of fiduciary duty as a director.

Transmittal Affidavit of Christopher P. Quinn (the "Quinn Aff.") Ex. 8 at art. VII, § 1. Section 102(b)(7) of the DGCL authorizes a Delaware corporation to include a provision in its certificate of incorporation exculpating directors from liability for money damages, subject to certain exceptions:

> [T]he certificate of incorporation may also contain ... [a] provision eliminating or limiting the personal liability of a director to the corporation or its stockholders for monetary damages for breach of fiduciary duty as a director, provided that such provision shall not eliminate or limit the liability of a director: (i) For any breach of the director's duty of loyalty to the corporation or its stockholders; (ii) for acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law; (iii) under § 174 of this title; or (iv) for any trans-

action from which the director derived an improper personal benefit.

8 *Del. C.* § 102(b)(7). The Exculpatory Clause thus shields the directors from personal liability for monetary damages for a breach of fiduciary duty, except liability for the four categories listed in Section 102(b)(7). "The totality of these limitations or exceptions ... is to ... eliminate ... director liability only for 'duty of care' violations. With respect to other culpable directorial actions, the conventional liability of directors for wrongful conduct remains intact." 1 David A. Drexler et al., *Delaware Corporation Law and Practice* § 6.02[7] at 6–18 (2013).

A provision like the Exculpatory Clause "will not place challenged conduct beyond judicial review." *Id.* § 6.02[7] at 6–19. The degree to which a court can classify claims as falling only within the duty of care and enter judgment based on the statutory immunity conferred by Section 102(b)(7) depends on the stage of the case, the standard of review, and the allegations or evidence to be considered.[13]

▇▇▇▇▇ Directors of a Delaware corporation owe two fiduciary duties—care and loyalty.[14] The duty of loyalty includes a requirement to act in good faith, which is

---

13. *Compare Emerald I*, 726 A.2d at 1223 (holding that in challenge to transaction with majority stockholder to which entire fairness applied, court could not apply Section 102(b)(7) on motion for summary judgment because factual conflicts required a trial to determine nature of the duty breached), *with Malpiede v. Townson*, 780 A.2d 1075, 1094–96 (Del.2001) (holding that in challenge to third-party, arm's length merger that was approved by fully informed stockholder vote, court could apply Section 102(b)(7) at pleadings stage unless plaintiff pled facts sufficient to show that a majority of the board was not disinterested or independent), *with Emerald II*, 787 A.2d at 93–94 (Del.2001) (holding that in challenge to transaction with majority stockholder to which entire fairness applied,

court could not apply Section 102(b)(7) without first analyzing transaction under entire fairness standard to determine nature of the fiduciary breach). *See generally* 1 Drexler, *supra*, § 6.02[7] at 6–21.

14. *Stone ex rel. AmSouth Bancorporation v. Ritter*, 911 A.2d 362, 370 (Del.2006); *accord Mills Acq. Co. v. Macmillan, Inc.*, 559 A.2d 1261, 1280 (Del.1989) ("[D]irectors owe fiduciary duties of care and loyalty to the corporation and its shareholders."); *Polk v. Good*, 507 A.2d 531, 536 (Del.1986) ("In performing their duties the directors owe fundamental fiduciary duties of loyalty and care to the corporation and its shareholders.").

"a subsidiary element, *i.e.*, a condition, of the fundamental duty of loyalty." *Stone*, 911 A.2d at 370 (internal quotation marks omitted). A plaintiff can call into question a director's loyalty by showing that the director was interested in the transaction under consideration or not independent of someone who was.[15] Or a plaintiff can demonstrate that the director failed to pursue the best interests of the corporation and its stockholders and therefore failed to act in good faith.[16] "[T]he duty of loyalty mandates that the best interest of the corporation and its shareholders takes precedence over any interest possessed by a director, officer or controlling shareholder and not shared by the stockholders

generally." *Technicolor Plenary II*, 634 A.2d at 361. Corporate fiduciaries "are not permitted to use their position of trust and confidence to further their private interests." *Guth v. Loft, Inc.*, 5 A.2d 503, 510 (Del.1939). "A failure to act in good faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation."[17]

To determine whether directors have met the standard of conduct imposed by their fiduciary obligations, Delaware courts evaluate the directors' actions through the lens of a standard of review.[18] Delaware's default standard of

**15.** See *Aronson v. Lewis*, 473 A.2d 805, 812 (Del.1984). In *Brehm*, 746 A.2d at 253–54, the Delaware Supreme Court overruled seven precedents, including *Aronson*, to the extent they reviewed a Rule 23.1 decision by the Court of Chancery under an abuse of discretion standard or otherwise suggested deferential appellate review. *Id.* at 253 n. 13. The *Brehm* Court held that, going forward, appellate review of a Rule 23.1 determination would be *de novo* and plenary. *Id.* at 253. This decision does not rely on any of these decisions for the standard of appellate review and therefore omits the cumbersome subsequent history.

**16.** See *In re Walt Disney Co. Deriv. Litig. (Disney II)*, 906 A.2d 27, 53 (Del.2006) ("Our law clearly permits a judicial assessment of director good faith for that former purpose [of rebutting the business judgment rule]."); *eBay Domestic Hldgs., Inc. v. Newmark*, 16 A.3d 1, 40 (Del.Ch.2010) ("Under Delaware law, when a plaintiff demonstrates the directors made a challenged decision in bad faith, the plaintiff rebuts the business judgment rule presumption, and the burden shifts to the directors to prove that the decision was entirely fair to the corporation and its stockholders."); *In re Walt Disney Co. Deriv. Litig. (Disney I)*, 907 A.2d 693, 760–79 (Del.Ch. 2005) (addressing whether board of directors breached its duties in connection with termination of corporation's president), *aff'd*, 906 A.2d 27.

**17.** *Disney II*, 906 A.2d at 67; *accord Stone*, 911 A.2d at 369 ("A failure to act in good

faith may be shown, for instance, where the fiduciary intentionally acts with a purpose other than that of advancing the best interests of the corporation ...." (quoting *Disney II*, 906 A.2d at 67)); *see Gagliardi v. TriFoods Int'l, Inc.*, 683 A.2d 1049, 1051 n. 2 (Del.Ch. 1996) (Allen, C.) (defining a "bad faith" transaction as one "that is authorized for some purpose other than a genuine attempt to advance corporate welfare or is known to constitute a violation of applicable positive law"); *In re RJR Nabisco, Inc. S'holders Litig.*, 1989 WL 7036, at *15 (Del.Ch. Jan. 31, 1989) (Allen, C.) (explaining that the business judgment rule would not protect "a fiduciary who could be shown to have caused a transaction to be effectuated (even one in which he had no financial interest) for a reason unrelated to a pursuit of the corporation's best interests").

**18.** For discussions of the distinction between the standard of conduct and the standard of review, see *In re Trados Inc. S'holder Litig. (Trados II)*, 73 A.3d 17, 36–45 (Del.Ch.2013); William T. Allen, Jack B. Jacobs & Leo E. Strine, Jr., *Realigning the Standard of Review of Director Due Care with Delaware Public Policy: A Critique of Van Gorkom and its Progeny as a Standard of Review Problem*, 96 Nw. U.L.Rev. 449, 451–53 (2002) [hereinafter *Realigning the Standard* ]; Melvin Aron Eisenberg, *The Divergence of Standards of Conduct and Standards of Review in Corporate Law*, 62 Fordham L.Rev. 437, 461–67 (1993); Julian Velasco, *The Role of Aspiration in Corporate Fiduciary Duties*, 54 Wm. & Mary L.Rev. 519, 553–58 (2012).

review is the business judgment rule, a principle of non-review that "reflects and promotes the role of the board of directors as the proper body to manage the business and affairs of the corporation." *In re Trados Inc. S'holder Litig. (Trados I)*, 2009 WL 2225958, at \*6 (Del.Ch. July 24, 2009). The rule presumes that "in making a business decision the directors of a corporation acted on an informed basis, in good faith and in the honest belief that the action taken was in the best interests of the company." *Aronson*, 473 A.2d at 812. Unless one of its elements is rebutted, "the court merely looks to see whether the business decision made was rational in the sense of being one logical approach to advancing the corporation's objectives." *In re Dollar Thrifty S'holder Litig.*, 14 A.3d 573, 598 (Del.Ch.2010). Only when a decision lacks any rationally conceivable basis will a court infer bad faith and a breach of duty.[19]

▮ In a transaction governed by the business judgment rule, the plaintiff has the burden at the pleadings stage to allege facts sufficient to rebut the presumptions of loyalty and good faith that protect the directors. Absent pled facts supporting a breach of the duty of loyalty, a court can apply Section 102(b)(7) summarily at the pleadings stage. *Malpiede*, 780 A.2d at

1094–96; *see Emerald II*, 787 A.2d at 90 (describing *Malpiede* as addressing the proper application of a Section 102(b)(7) provision "in a pretrial procedural context, when the applicable standard of judicial review was the business judgment rule").

▮ Entire fairness is Delaware's most onerous standard of review. It applies when a plaintiff rebuts one or more of the presumptions of the business judgment rule.[20] It also applies, as in this case, when a plaintiff challenges a transaction between the corporation and its majority stockholder where the majority stockholder has not sufficiently disabled itself from exercising influence during the negotiation and approval of the transaction at both the board and the stockholder levels. *See* Part II.B., *supra.* When entire fairness applies, the defendants bear the burden of proving "to the court's satisfaction that the transaction was the product of both fair dealing *and* fair price." *Technicolor Plenary IV*, 663 A.2d at 1163.

▮ When evaluating, negotiating, and deciding whether to approve and recommend the merger, the Special Committee members were obligated to act loyally, prudently, and in good faith for the purpose of maximizing the long-term value of the corporation for the benefit of its resid-

**19.** *See Realigning the Standard, supra,* at 452 (defining an irrational decision as "one that is so blatantly imprudent that it is inexplicable, in the sense that no well-motivated and minimally informed person could have made it"); *see also Brehm,* 746 A.2d at 264 ("Irrationality is the outer limit of the business judgment rule. Irrationality may be the functional equivalent of the waste test or it may tend to show that the decision is not made in good faith, which is a key ingredient of the business judgment rule." (footnote omitted)); *In re J.P. Stevens & Co. S'holders Litig.,* 542 A.2d 770, 780–81 (Del.Ch.1988) ("A court may, however, review the substance of a business decision made by an *apparently* well motivated board for the limited purpose of assessing

whether that decision is so far beyond the bounds of reasonable judgment that it seems essentially inexplicable on any ground other than bad faith.").

**20.** *Disney II,* 906 A.2d at 52 (explaining that the business judgment rule can be rebutted by establishing that "the directors breached their fiduciary duty of care or of loyalty or acted in bad faith" and that "[i]f that is shown, the burden then shifts to the director defendants to demonstrate that the challenged act or transaction was entirely fair to the corporation and its shareholders"); *accord Emerald II,* 787 A.2d at 91; *Brehm,* 746 A.2d at 264 n. 66.

ual claimants, *viz.*, the common stockholders.[21] "When deciding whether to pursue a strategic alternative that would end or fundamentally alter the stockholders' ongoing investment in the corporation, the loyalty-based standard of conduct requires that the alternative yield value exceeding what the corporation otherwise would generate for stockholders over the long-term."[22] Importantly, "[t]he duty to act for the ultimate benefit of stockholders does not require that directors fulfill the wishes of a particular subset of the stockholder base."[23] Directors must exercise

**21.** *See Gantler v. Stephens*, 965 A.2d 695, 706 (Del.2009) (holding that "enhancing the corporation's long term share value" is a "distinctively corporate concern[ ]"); *N. Am. Catholic Educ. Programming Found., Inc. v. Gheewalla*, 930 A.2d 92, 101 (Del.2007) ("The directors of Delaware corporations have the legal responsibility to manage the business of a corporation for the benefit of its shareholder[ ] owners." (internal quotation marks omitted)); *Unocal Corp. v. Mesa Petroleum Co.*, 493 A.2d 946, 955 (Del.1985) (citing "the basic principle that corporate directors have a fiduciary duty to act in the best interests of the corporation's stockholders"); *eBay*, 16 A.3d at 34 (explaining that directors must seek "to promote the value of the corporation for the benefit of its stockholders"); *TW Servs., Inc. v. SWT Acq. Corp.*, 1989 WL 20290, at *7 (Del.Ch. Mar. 2, 1989) (Allen, C.) (describing as "non-controversial" the proposition that "the interests of the shareholders as a class are seen as congruent with those of the corporation in the long run" and explaining that "[t]hus, broadly, directors may be said to owe a duty to shareholders as a class to manage the corporation within the law, with due care and in a way intended to maximize the long run interests of shareholders"); William T. Allen, *Ambiguity in Corporation Law*, 22 Del. J. Corp. L. 894, 896–97 (1997) ("[I]t can be seen that the proper orientation of corporation law is the protection of long-term value of capital committed indefinitely to the firm."); Andrew A. Schwartz, *The Perpetual Corporation*, 80 G. Wash. L.Rev. 764, 777–83 (2012) (arguing that the corporate attribute of perpetual existence calls for a fiduciary mandate of long-term value maximization for the stockholders' benefit).

**22.** *Trados II*, 73 A.3d at 37. *Compare Paramount Commc'ns Inc. v. QVC Network Inc.*, 637 A.2d 34, 43–44 (Del.1994) (holding it was reasonably probable that directors breached their fiduciary duties by pursuing ostensibly superior value to be created by long-term strategic combination when, post-transaction, a controller would have "the power to alter that vision," rendering its value highly contingent), *and Revlon, Inc. v. MacAndrews & Forbes Hldgs., Inc.*, 506 A.2d 173, 182 (Del.1986) (holding that alternative of maintaining corporation as stand-alone entity and use of defensive measures to preserve that alternative "became moot" once board determined that values achievable through a sale process exceeded board's assessment of stand-alone value), *with Paramount Commc'ns, Inc. v. Time Inc.*, 571 A.2d 1140, 1155 (Del.1990) (holding it was not reasonably probable that directors breached their fiduciary duties by pursuing superior long-term value of strategic, stock-for-stock merger without a post-transaction controller), *Unocal*, 493 A.2d at 956 (holding it was not reasonably probable that directors breached their fiduciary duties by adopting a selective exchange offer to defend against a two-tiered tender offer where blended value of offer was less than $54 per share and board reasonably believed stand-alone value of corporation was much greater), *and Air Prods. & Chems., Inc. v. Airgas, Inc.*, 16 A.3d 48, 108–09, 112, 129 (Del.Ch.2011) (holding that board complied with fiduciary duties by maintaining a rights plan to protect higher stand-alone value of corporation rather than permit immediate sale).

**23.** *Trados II*, 73 A.3d at 38; *accord In re Lear Corp. S'holder Litig.*, 967 A.2d 640, 655 (Del. Ch.2008) (Strine, V.C.) ("Directors are not thermometers, existing to register the ever-changing sentiments of stockholders.... During their term of office, directors may take good faith actions that they believe will benefit stockholders, even ·if they realize that the stockholders do not agree with them."); *Paramount Commc'ns Inc. v. Time Inc.*, 1989 WL 79880, at *30 (Del.Ch. July 14, 1989) (Allen, C.) ("The corporation law does not operate on the theory that directors, in exercising their powers to manage the firm, are obligated to follow the wishes of a majority of shares. In fact, directors, not shareholders, are charged with the duty to manage the firm."), *aff'd in pertinent part*, 571 A.2d 1140; *TW Servs.,*

their independent fiduciary judgment: "Delaware law confers the management of the corporate enterprise to the stockholders' duly elected board representatives. The fiduciary duty to manage a corporate enterprise includes the selection of a time frame for achievement of corporate goals. That duty may not be delegated to the stockholders." *Time*, 571 A.2d at 1154 (citation omitted).

■ These principles continue to hold when a single stockholder owns a majority of the equity and wishes to acquire the balance of the shares. "[D]irector primacy remains the centerpiece of Delaware law, even when a controlling stockholder is present." *In re CNX Gas Corp. S'holders Litig.*, 2010 WL 2291842, at *15 (Del.Ch. May 25, 2010).

> The reality is that controlling stockholders have no inalienable right to usurp the authority of boards of directors that they elect. That the majority of a company's voting power is concentrated in one stockholder does not mean that that stockholder must be given a veto over board decisions when such a veto would not also be afforded to dispersed stockholders who collectively own a majority of the votes. Like other stockholders, a controlling stockholder must live with the informed (i.e., sufficiently careful) and good faith (i.e., loyal) business decisions of the directors unless the DGCL requires a vote. That is a central premise of our law, which vests most managerial power over the corporation in the board, and not in the stockholders.

*Hollinger Inc. v. Hollinger Int'l, Inc. (Hollinger II)*, 858 A.2d 342, 387 (Del.Ch. 2004) (Strine, V.C.), *appeal refused*, 2004 WL 1732185, at *1 (Del. July 29, 2004)

1989 WL 20290, at *8 n. 14 ("While corporate democracy is a pertinent concept, a corporation is not a New England town meeting; directors, not shareholders, have responsibili-

(TABLE). In negotiating with Dimensional, therefore, the members of the Board, including the members of the Special Committee, owed a duty of loyalty to the stockholders to seek the alternative that maximized the value of their residual claims without regard to the particular interests of the controller. That alternative could well have been no transaction at all.

■ A controlling stockholder transaction "of course is the context in which the greatest risk of undetectable bias may be present." *Tremont I*, 1996 WL 145452, at *7. Under controlling Delaware Supreme Court precedent, entire fairness governs a controlling stockholder transaction, even if a special committee of independent directors *or* a majority-of-the-minority vote is used, because of the risk that when push comes to shove, directors who appear to be independent and disinterested will favor or defer to the interests and desires of the majority stockholder. *See Kahn v. Lynch Commc'n Sys., Inc.*, 638 A.2d 1110, 1116–17 (Del.1994).

> In colloquial terms, the Supreme Court saw the controlling stockholder as the 800–pound gorilla whose urgent hunger for the rest of the bananas is likely to frighten less powerful primates like putatively independent directors who might well have been hand-picked by the gorilla (and who at the very least owed their seats on the board to his support).

*Pure Res.*, 808 A.2d at 436. Although in theory a special committee of independent directors "is best positioned to extract a price at the highest possible level because it does not suffer from the collective action problem of disaggregated stockholders," the men and women who populate the

ties to manage the business and affairs of the corporation, subject however to a fiduciary obligation.").

committees are rarely individuals "whose own financial futures depend importantly on getting the best price and, history shows, [they] are sometimes timid, inept, or . . ., well, let's just say worse." *In re Cox Commc'ns, Inc. S'holders Litig.,* 879 A.2d 604, 619 (Del.Ch.2005) (Strine, V.C.). Particularly in controlling stockholder transactions, there is the risk that "that the outside directors might be more independent in appearance than in substance." *Id.*

The entire fairness test helps uncover situations where facially independent and disinterested directors have failed to act loyally and in good faith to protect the interests of the corporation and the stockholders as a whole and instead have given in to or favored the interests of the controller. *Tremont II,* 694 A.2d at 428–29. By reviewing independently the procedural and substantive fairness of the transaction with the burden of proof on the defendant directors, the court can identify those situations and, if necessary, impose a remedy. *Id.*

▆▆▆ What this means for purposes of Section 102(b)(7) is that when a case involves a controlling stockholder with entire fairness as the standard of review, and when there is evidence of procedural and substantive unfairness, a court cannot summarily apply Section 102(b)(7) on a motion for summary judgment to dismiss facially independent and disinterested directors. Under those circumstances, it is not possible to hold as a matter of law that "the factual basis for [the] claim *solely* implicates a violation of the duty of care." *Emerald I,* 726 A.2d at 1224. Rather, "the inherently interested nature of [the transaction becomes] inextricably intertwined with issues of loyalty." *Emerald II,* 787 A.2d at 93; *accord Tremont II,* 694 A.2d at 428 (explaining that in such a case, "the underlying factors which raise the specter

of impropriety can never be completely eradicated and still require careful judicial scrutiny"). The court must conduct a trial, determine whether the transaction was entirely fair, and if not, "identify the breach or breaches of fiduciary duty upon which liability for damages will be predicated in the *ratio decidendi* of its determination that entire fairness has not been established." *Emerald II,* 787 A.2d at 94 (internal quotation marks omitted). Only then can the court conduct the director-by-director analysis necessary to determine who is exculpated from liability. *Id.* "The director defendants can avoid personal liability for paying monetary damages only if they have established that their failure to withstand an entire fairness analysis is exclusively attributable to a violation of the duty of care." *Id.* at 98. The burden of making this showing in an entire fairness case "falls upon the director." *Emerging Commc'ns,* 2004 WL 1305745, at *40; *accord Gesoff v. IIC Indus., Inc.,* 902 A.2d 1130, 1164 (Del.Ch.2006) ("[I]n an entire fairness case where the court has found that a challenged transaction is not entirely fair, a director seeking to rely on the exculpatory provision must show that any liability of his is exclusively attributable to a violation of the duty of care." (internal quotation marks omitted)).

The Special Committee defendants have ignored this authority and briefed the Section 102(b)(7) issue as if they had filed a motion to dismiss in a case governed by the business judgment rule. They did not address the evidence in the record, but rather focused on the allegations of the complaint. They framed the loyalty inquiry in terms of whether the Special Committee members were nominally disinterested and independent, and they addressed only one means by which a director could fail to act in good faith: when a director "intentionally fails to act

in the face of a known duty to act, demonstrating a conscious disregard for his duties." Special Comm. Opening Br. at 33 (quoting *Disney II*, 906 A.2d at 67). The litigable issue involving good faith in this case is whether, when push came to shove, the Special Committee members favored the interests of Dimensional over the interests of the minority stockholders. Given the record evidence that could support a finding of an unfair process and an unfair price, the plaintiffs' claims are "inextricably intertwined with issues of loyalty." *Emerald II*, 787 A.2d at 93. It will require a trial to determine whether the merger was unfair and, if so, to "identify the breach or breaches of fiduciary duty upon which liability for damages will be predicated." *Id.* at 94 (internal quotation marks omitted). It will then be necessary to examine each of the individual defendants to determine whether the Exculpatory Clause applies. *See, e.g., Emerging Commc'ns*, 2004 WL 1305745, at *38 ("The liability of the directors must be determined on an individual basis because the nature of their breach of duty (if any), and whether they are exculpated from liability for that breach, can vary for each director.").

The Exculpatory Clause remains a strong defense. This court has held in post-trial decisions that a Section 102(b)(7) provision protected independent directors who served on a special committee from monetary liability even though they negotiated a transaction with a controller that failed the test of fairness. *See, e.g., Gesoff*, 902 A.2d at 1166–67; *Emerging*

*Commc'ns*, 2004 WL 1305745, at *42–43. But it is also possible, depending on the directors' demeanor and credibility at trial, that the defendants could fail to meet their burden of proof and that the evidence could support an adverse finding regarding the motives of one or more of the Special Committee members. It is premature in this case to make a determination regarding exculpation under Section 102(b)(7) without first determining whether the transaction was entirely fair, determining whether liability exists and on what basis, considering the evidence as a whole, and evaluating the involvement of each of the individual directors. *See Emerald II*, 787 A.2d at 94.

### 2. Rescissory Damages

 The Dimensional defendants argue that the plaintiffs cannot, under any circumstances, obtain an award of rescissory damages. Rescissory damages are "the monetary equivalent of rescission" and may be awarded where "the equitable remedy of rescission is impractical." [24] The remedy is available for an adjudicated breach of the duty of loyalty, such as cases involving self dealing or where a fiduciary puts personal interests ahead of the interests of its beneficiary. *See Strassburger v. Earley*, 752 A.2d 557, 581 (Del.Ch.2000); *Technicolor Plenary III*, 663 A.2d at 1144. In a case where a disloyal fiduciary wrongfully deprives its beneficiary of property, the rescissory damages measure seeks (i) to restore the plaintiff-beneficiary to the position it could have been in had the plaintiff or a faithful fiduciary exercised

---

**24.** *Lynch v. Vickers Energy Corp. (Vickers II)*, 429 A.2d 497, 501 (Del.1981), *overruled in part on other grounds, Weinberger*, 457 A.2d at 714; *accord In re S. Peru Copper Corp. S'holder Deriv. Litig.*, 52 A.3d 761, 815 (Del.Ch. 2011) (Strine, C.) ("Rescissory damages are the economic equivalent of rescission ....."), *aff'd sub nom, Ams. Mining Corp. v. Theriault*, 51 A.3d 1213 (Del.2012); *Technicolor Plenary III*, 663 A.2d at 1144 (explaining that rescissory damages are warranted "when equitable rescission of a transaction would be appropriate, but is not feasible"). *See generally* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery* § 12.04[b] (2012).

control over the property in the interim and (ii) to force the defendant to disgorge profits that the defendant may have achieved through the wrongful retention of the plaintiff's property. *See Strassburger*, 752 A.2d at 580–81; *Technicolor Plenary III*, 663 A.2d at 1144–47. In a case involving corporate stock, rescissory damages can be measured at the time of judgment, the time of resale, or at an intervening point when the stock had a higher value and remained in control of the disloyal fiduciary.[25]

Delaware Supreme Court decisions hold that rescissory damages are one appropriate measure of damages for a controlling stockholder squeeze-out like the merger. In the first of two appeals in the *Vickers* litigation, the Delaware Supreme Court held that a majority stockholder breached its duty of disclosure in connection with a two-step going-private transaction and remanded the case for a determination of damages. *Vickers I*, 383 A.2d at 280, 282. On remand, the Court of Chancery held that the proper measure of damages was the plaintiffs' out-of-pocket loss, measured by the difference between the intrinsic value of the plaintiffs' shares and the deal price. To determine the fair value of the shares, the Court of Chancery held that "a proceeding analogous to an appraisal hearing such as is provided for in merger cases is appropriate here in a situation in which active fraud has not been alleged or proved." *Lynch v. Vickers Energy Corp.*, 402 A.2d 5, 11 (Del.Ch.1979) (citation omitted), *rev'd*, 429 A.2d 497 (Del.1981).

In the second appeal, the Delaware Supreme Court reversed again, holding that the trial court erred by awarding out-of-pocket damages on the facts of the case. The *Vickers II* decision explained that when a breach of fiduciary duty has been alleged and proven against a self-interested controlling stockholder, the stockholder plaintiffs are not limited to an out-of-pocket measure, but rather can seek rescission or rescissory damages. 429 A.2d at 501. The Delaware Supreme Court stated that "[r]escission is the preferable remedy and if the controversy in its present form had been here in an earlier stage of the litigation, it might well be ordered." *Id.* Because rescission was not feasible, the Supreme Court explained that

> a fair result can be accomplished ... by ordering damages which are the monetary equivalent of rescission and which will, in effect, equal the increment in value that Vickers enjoyed as a result of acquiring and holding the TransOcean stock in issue. That is consistent with the basis for liability ..., and it is a norm applied when the equitable remedy of rescission is impractical.

*Id.* The Supreme Court required Vickers "to pay rescissory damages to plaintiffs measured by the equivalent value of the TransOcean stock at the time of judgment," *id.* at 503, citing in support "the well settled law that entitles a beneficiary to claim all advantages actually gained by a fiduciary as a result of a breach of trust," *id.* at 503 n. 5.

---

**25.** *See Duncan v. TheraTx, Inc.*, 775 A.2d 1019, 1023 (Del.2001); *Vickers II*, 429 A.2d at 501; *Reis*, 28 A.3d at 468; *cf. Paradee v. Paradee*, 2010 WL 3959604, at *13 (Del.Ch. Oct. 5, 2010) (awarding damages against trustee who breached her duty of loyalty "measured using the highest intermediate value of the shares less the value at the time of judgment" and noting that "[a]lthough it would be improbable (bordering on impossible) for the Trust to have sold precisely at the top of the market, the faithless fiduciary must bear that risk, not the innocent beneficiary"); *duPont v. Del. Trust Co.*, 364 A.2d 157, 161 (Del.Ch. 1975) (surcharging trustee and explaining that "the risk of fluctuations in the value" of the stock is to be borne "by the wrongdoer").

Later Delaware Supreme Court decisions have continued to cite rescissory damages as an appropriate remedy in a squeeze-out merger. In *Weinberger,* the Delaware Supreme Court overruled *Vickers II* only "to the extent that it purports to limit a stockholder's monetary relief to a specific damage formula." 457 A.2d at 704. As discussed below, the *Weinberger* court held that when a merger has been successfully challenged, the possible forms of monetary relief include an out-of-pocket measure of damages equal to what a stockholder would have received in an appraisal, *viz.,* the fair value of the stockholder's shares. *Id.* at 713–14. This remedy, less the consideration received in the transaction, provides the stockholder with the monetary equivalent of its proportionate share of the value of the corporation as a going concern. But in making this remedy available, the *Weinberger* court stressed that it "[did] not intend any limitation on the historic powers of the Chancellor to grant such other relief as the facts of a particular case may dictate." *Id.* at 714. Damages equal to the fair value that a stockholder could obtain in an appraisal would be one possible remedy, but not the only remedy. In cases involving "fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching," the Court of Chancery would retain power "to fashion any form of equitable and monetary relief as may be appropriate, including rescissory damages." *Id.* The Supreme Court remanded the case with instructions to the Chancellor to award fair value, but to exercise his "discretion [to craft] the award, if any, ... in the form of monetary damages based upon entire fairness standards." *Id.*

After *Weinberger,* rescissory damages constituted one possible remedy, but not the exclusive "remedial formula." *Id.* Since *Weinberger,* the Delaware Supreme Court has cited the availability of rescisso-ry damages in other decisions. *See, e.g., Oberly v. Kirby,* 592 A.2d 445, 466 (Del. 1991) (stating that if transaction failed to satisfy entire fairness test, "the stockholders may ... demand rescission of the transaction or, if that is impractical, the payment of rescissory damages"); *Cede & Co. v. Technicolor, Inc. (Technicolor Plenary I),* 542 A.2d 1182, 1191 (Del.1988) ("[I]f it is determined that the merger should not have occurred due to ... breach of fiduciary duty, or other wrongdoing on the part of the defendants, then ... [the plaintiff] will be entitled to ... rescissory damages."), *modified on subsequent appeal,* 634 A.2d 345, 372 (Del.1993) (conditioning award of rescissory damages on "a defendant's failure to meet its burden of showing the entire fairness of the transaction"). The Supreme Court has emphasized that an out-of-pocket, quasi-appraisal damages remedy may not be adequate "particularly where fraud, misrepresentation, self-dealing, deliberate waste of corporate assets, or gross and palpable overreaching are involved." *Rabkin,* 498 A.2d at 1104 (quoting *Weinberger,* 457 A.2d at 714); *accord Ala. By–Products Corp. v. Neal,* 588 A.2d 255, 257 (Del.1991) (same). *See generally* Wolfe & Pittenger, *supra,* § 12.04[b] at 12–72 ("[T]he Delaware Supreme Court has suggested on more than one occasion that rescissory damages are the preferred remedial measure where a transaction fails to pass the test of entire fairness....").

Dimensional essentially argues that rescissory damages are unavailable because the plaintiffs did not rush to file their case upon the announcement of the merger or shortly after it closed but rather sued approximately two years later, well within the three year statute of limitations that serves as a guide for applying the doctrine of laches to breach of fiduciary duty claims. 10 *Del. C.* § 8106(a). In March

2012, approximately nineteen months after the merger closed, Sony Music acquired Orchard. Dimensional argues that the plaintiffs cannot use the Sony Music transaction as a valuation indicator for rescissory damages.

Delaware Supreme Court precedents do not support Dimensional's position. In *Vickers II,* the Supreme Court held in 1981 that rescissory damages should be awarded for a transaction that closed in 1974, seven years earlier. In *Weinberger,* the Supreme Court held in 1983 that monetary damages "based upon entire fairness standards," including potential rescissory elements of relief, could be awarded for a transaction that closed in 1978, five years earlier. In *Technicolor Plenary I,* the Supreme Court stated in 1988 that rescission would be a possible post-trial remedy for a transaction that took place in 1983, five years earlier. The Supreme Court reiterated in 1993 that rescissory damages could be awarded if the transaction, then ten years in the past, failed the test of fairness. *Technicolor Plenary II,* 634 A.2d at 372; *see also Strassburger,* 752 A.2d at 579, 582 (awarding rescissory damages against disloyal fiduciaries when a complaint was not filed until nine months post-transaction, the plaintiff made "[n]o effort" to expedite the case, and the matter did not reach trial until "four years later").

■■■ The passage of time of course plays a role in the availability of rescissory damages, but less so for rescissory damages than with true rescission. This is because the passage of time may be what renders rescission impractical and requires the deployment of rescissory damages as the functional equivalent. *See* Wolfe & Pittenger, *supra,* § 12.04[b] at 12–68; *see also Cede & Co. v. Technicolor, Inc.,* 1987 WL 4768, at *7 (Del.Ch. Jan. 20, 1987) (Allen, C.) ("Rescissory damages—a money award designed to be as nearly as possible the financial equivalent of rescission, is another possibility where a substantial delay occurs between the merger and trial."), *rev'd in part on other grounds,* 542 A.2d 1182 (Del.1988). The passage of time remains important and correlates with two other concerns about rescissory damages. One is that delay could generate a windfall award by including "elements of value causally unrelated to the wrongdoing." *Strassburger,* 752 A.2d at 580. A second is that the plaintiff might "sit back and 'test the waters,' " see how the transaction plays out, and then sue for rescissory damages if the deal turned out well for the other side. *Gaffin v. Teledyne, Inc.,* 1990 WL 195914, at *17 (Del.Ch. Dec. 4, 1990), *aff'd in part,* 611 A.2d 467 (Del.1992); *accord Gotham P'rs, L.P. v. Hallwood Realty P'rs, L.P.,* 795 A.2d 1, 36 (Del.Ch.2001) (declining to award rescission when plaintiff's delay enabled the plaintiff "to see what the market price for Partnership units would do, and to sue only if the Odd Lot resales turned out to be favorable"), *aff'd in part,* 817 A.2d 160, 175 (Del.2002) (affirming Court of Chancery's decision declining to award rescission as an appropriate exercise of discretion). Mitigating the effects of the passage of time is the degree to which the party opposing the remedy bears responsibility for the delay. *Ginsburg v. Phila. Stock Exch., Inc.,* 2007 WL 1662661, at *2 (Del.Ch. May 31, 2007). "To find otherwise serves no interest of justice, and merely provides defendants with an incentive to run down the clock." *Id.*

An award of rescissory damages is one form of relief that could be imposed if the merger is found not to be entirely fair *and* if one or more of the defendants are found to have violated their fiduciary duty of loyalty. Any award of rescissory damages only would be imposed on those fiduciaries who committed a loyalty breach. If appro-

priate, rescissory damages could be crafted using the Orchard/Sony Merger as the point of resale, but that would depend on the evidence presented at trial and the specific arguments of the parties. It is premature at this point to hold as a matter of law that rescissory damages could never be awarded.

### 3. Quasi–Appraisal

■ All defendants contend that quasi-appraisal is not an available remedy. The Dimensional defendants say that quasi-appraisal only can be awarded in a short-form merger when disclosure violations interfere with the ability of minority stockholders to seek statutory appraisal. The Special Committee defendants largely agree, but also would recognize quasi-appraisal in a long-form merger with a majority stockholder where the vote is a *fait accompli* such that agency costs are high and market competition is distorted. Delaware precedent does not support these narrow constructions of the quasi-appraisal remedy.

### a. Quasi–Appraisal As Damages

■ "Quasi-appraisal" is simply a short-hand description of a measure of damages. It refers to the quantum of money equivalent to what a stockholder would have received in an appraisal, namely the fair value of the stockholder's proportionate share of the equity of the corporation as a going concern. This measure is a form of compensatory or "out-of-pock-et" damages, which are generally measured by the harm inflicted on the plaintiff at the time of the wrong.[26] Quasi-appraisal contrasts with other potential measures of damages, such as reliance damages, expectancy damages, rescissory damages, disgorgement, and punitive damages. Because quasi-appraisal is a measure of damages, different causes of action can give rise to a quasi-appraisal remedy, just as different causes of action can give rise to other forms of remedies. *Cf.* Wolfe & Pittenger, *supra,* § 12.04[a] at 12–60 to 12–61 (citing multiple causes of action that can lead to rescission as a remedy).

One cause of action where the Delaware Supreme Court and the Court of Chancery consistently have held that quasi-appraisal damages are available is when a fiduciary breaches its duty of disclosure in connection with a transaction that requires a stockholder vote. The premise for the award is that without the disclosure of false or misleading information, or the failure to disclose material information, stockholders could have voted down the transaction and retained their proportionate share of the equity in the corporation as a going concern. Quasi-appraisal damages serve as a monetary substitute for the proportionate share of the equity that the stockholders otherwise would have retained.

The Delaware Supreme Court coined the term "quasi-appraisal" in *Weinberger.* That landmark decision involved a challenge by a class of stockholder plaintiffs to

---

**26.** *See Poole v. N.V. Deli Maatschappij,* 224 A.2d 260, 262 (Del.1966) (affirming use of "out-of-pocket" damages as measure of damages in challenge to majority stockholder's tender offer involving fraudulent misrepresentations); *id.* at 265 (defining appropriate "out-of-pocket" measure as "the difference between the price paid for the stock and its true value"); *see also Poole v. N.V. Deli Maatschappij,* 243 A.2d 67, 69 (Del.1968) (affirming Court of Chancery's conclusion that when determining the stock's "true value" for purposes of compensatory damages, "the stock is to be evaluated on a going-concern basis and not on a liquidation basis; that the actual or true [value] of the stock is to be determined by considering the various factors of value including earnings, dividends, market price, assets, and the other factors deemed relevant in a stock evaluation problem arising under ... 8 *Del. C.* § 262").

a long-form, cash-out merger effectuated in 1978 by the Signal Companies, Inc., the controlling stockholder of UOP, Inc. The merger had not been negotiated by a special committee of independent directors, but it was conditioned on a majority-of-the-minority vote. The majority-of-the-minority vote did not have any salutary legal effect because of the disclosure violations. *See* 457 A.2d at 714 ("Given the lack of any candid disclosure of the material facts surrounding establishment of the $21 price, the majority of the minority vote, approving the merger, is meaningless."). The plaintiffs alleged that Signal and the UOP directors breached their fiduciary duties by approving a transaction that was not entirely fair, either as to process or price. The Court of Chancery issued a post-trial decision in favor of the defendants.

On appeal, the Delaware Supreme Court reversed. The Supreme Court held that "[m]aterial information, necessary to acquaint [the minority] shareholders with the bargaining positions of [the majority stockholder], was withheld under circumstances amounting to a breach of fiduciary duty." *Id.* at 703. The Supreme Court "therefore conclude[d] that this merger does not meet the test of fairness." *Id.* In terms of the damages remedy, the Delaware Supreme Court took pains to stress that *Vickers II* had not made rescissory damages the exclusive measure of damages for breaches of the duty of disclosure. *Id.* at 704. The *Weinberger* decision held instead that the possible forms of monetary relief included damages equivalent to what a stockholder would have received in an appraisal, *viz.*, the fair value of the stockholder's shares, representing the monetary equivalent of the proportionate share of the value of the corporation as a going concern. *Id.* at 713–14.

The availability of this remedy led the *Weinberger* court to address a second re-medial issue: the cramped and stylized weighted average methodology, known as the Delaware block method, that Delaware courts traditionally used to calculate fair value in an appraisal. "[T]o give full effect to section 262 within the framework of the General Corporation Law," the Supreme Court "adopt[ed] a more liberal, less rigid and stylized, approach to the valuation process than has heretofore been permitted by our courts." *Id.* at 704. Under its new approach, the high court permitted "proof of value by any techniques or methods which are generally considered acceptable in the financial community and otherwise admissible in court." *Id.* at 713. The *Weinberger* court further held that the standard for evaluating the fair price aspect of the entire fairness test was equivalent to the fair value standard for an appraisal. *Id.* at 713–14. Consequently, the new "liberal approach" to valuation applied both under the entire fairness test *and* in a statutory appraisal. *Id.* at 713. But there would remain a critical difference: In a statutory appraisal, the fair value standard would determine the amount of money per share that the dissenting stockholder would receive. Under the entire fairness test, the fair price measure would operate as an aspect of the standard of review; it would not inherently require a damages award in that amount.

These significant changes created potential unfairness to stockholders who had made decisions based on the prior Delaware regime. The changes in the law made by the *Weinberger* court effectively created a disclosure issue for closed transactions and for pending transactions where corporations might have difficulty providing updated disclosures. In the words of the *Weinberger* court, many stockholders "like the plaintiff" likely had "abjured an appraisal" based on the prior state of the law. *Id.* at 714. To address those plaintiffs' claims, the Supreme Court held that

the equitable remedy it approved would be available in

(1) this case; (2) any case now pending on appeal to this Court; (3) any case now pending in the Court of Chancery which has not yet been appealed but which may be eligible for direct appeal to this Court; (4) any case challenging a cash-out merger, the effective date of which is on or before February 1, 1983; and (5) any proposed merger to be presented at a shareholders' meeting, the notification of which is mailed to the stockholders on or before February 23, 1983.

*Id.* at 714–15.[27] The Delaware Supreme Court issued its decision in *Weinberger* on Tuesday, February 1, 1983, creating a post-decision window of twenty-two calendar days (sixteen business days).

The *Weinberger* decision seemed to contemplate that going forward, a statutory appraisal would be the primary remedy available to stockholders after a cash-out merger.[28] After that point, under the *Weinberger* framework, a stockholder plaintiff not only would have to state a claim for breach of fiduciary duty, but also demonstrate why the newly liberalized appraisal remedy was inadequate.[29] But as

---

**27.** *See, e.g., Kahn v. Household Acq. Corp.,* 591 A.2d 166, 168, 173 (Del.1991) (affirming quasi-appraisal award as damages remedy for breach of fiduciary duty lawsuit challenging controller's long-form, squeeze-out merger where lawsuit was pending when *Weinberger* issued); *Bershad,* 535 A.2d at 848 (holding that stockholders who tendered their shares in a controlling stockholder's first-step tender offer as part of a squeeze-out effectuated during the *Weinberger* window waived their ability to challenge the merger as a breach of fiduciary duty and seek quasi-appraisal damages).

**28.** *See* 457 A.2d at 714 ("[A] plaintiff's monetary remedy ordinarily should be confined to the more liberalized appraisal proceeding herein established . . . ."); *id.* ("[T]he provisions of 8 *Del. C.* § 262, as herein construed, respecting the scope of an appraisal and the means for perfecting the same, shall govern the financial remedy available to minority shareholders in a cash-out merger."); *id.* (explaining that this ruling returned to prior cases "mandating a stockholder's recourse to the basic remedy of an appraisal").

**29.** This is how contemporary post-*Weinberger* Court of Chancery opinions understood the *Weinberger* decision. *See, e.g., Stepak v. Scharffenberger,* 1985 WL 11579, at *2 (Del. Ch. Aug. 9, 1985) ("In [*Weinberger*], the Delaware Supreme Court announced that the sole financial remedy for minority shareholders challenging a cash-out merger is an expanded appraisal proceeding" unless the plaintiff "plead[s] facts sufficient to demonstrate the inadequacy of the appraisal remedy. . . .");

*Shapiro v. Pabst Brewing Co.,* 1985 WL 11578, at *4 (Del.Ch. July 30, 1985) ("To survive a motion to dismiss, the complaint must allege facts which, if true, would render the appraisal remedy inadequate."); *Weinberger v. Palm Beach, Inc.,* 1985 WL 11581, at *1 (Del.Ch. July 9, 1985) ("In the context of a proposed cash-out merger, the viability of plaintiffs' [breach of fiduciary duty] claims turns upon whether the complaint alleges facts which, if true, would render appraisal inadequate."); *Glassman v. Wometco Cable TV, Inc.,* 1985 WL 11569, at *4 (Del.Ch. June 19, 1985) ("It is clear that under [*Weinberger*], appraisal is the sole remedy in a cash out merger unless it can be shown that an appraisal would be an inadequate remedy."); *Patents Mgmt. Corp. v. O'Connor,* 1985 WL 11576, at *2 (Del.Ch. June 10, 1985) ("In *Weinberger,* the Supreme Court designated appraisal as the sole financial remedy for aggrieved shareholders challenging a cash-out merger, and specifically relegated claims of unfair dealing as well as unfair price to the new, liberalized appraisal proceeding."); *Weingarden v. Meenan Oil Co.,* 1985 WL 44705, at *4 (Del.Ch. Jan. 2, 1985) ("Inasmuch as the complaint fails to allege any facts which, if true, would indicate that appraisal is an inadequate remedy, defendants' motion to dismiss must be granted."); *Wilen v. Pollution Control Indus., Inc.,* 1984 WL 8272, at *2 (Del.Ch. Oct. 15, 1984) ("In [*Weinberger*], the Delaware Supreme Court made it clear that where a challenge to a merger involves only the alleged inadequacy of the consideration exchanged for the stock, the sole remedy of the dissatisfied shareholders will be a liberalized appraisal proceeding

several Delaware decisions have explained, the Delaware Supreme Court subsequently took a broad view of the situations when stockholders could assert breach of fiduciary duty challenges to mergers.[30] One practical consequence has been an expanded role for the quasi-appraisal damages remedy.

After *Weinberger*, a series of Court of Chancery decisions recognized that quasi-appraisal damages could serve as an adequate and fitting monetary remedy for a breach of the fiduciary duty of disclosure. The first such opinion was the decision on remand in *Weinberger* itself. After noting that the Supreme Court's finding of unfairness turned on a disclosure violation,[31] Chancellor Brown explained the premise on which he would craft a remedy, namely that

> the breach of fiduciary duty by Signal deprived the minority of a fair opportunity to vote down the proposed merger in the event that the owners of a majority of their voting shares, had they been provided with all material information, might have reached the collective conclusion that the proposed $21 per share merger price was inadequate.

*Id.* at *9. Under those circumstances, the Chancellor noted the traditional remedial option would have been rescission. *See id.* at *3 ("[T]he minority shareholders ... would normally be entitled under such circumstances to have the merger rescinded and their former shares returned to them."). Because "intervening factors" made rescission "logically impractical," the next approach was rescissory damages on the premise that "the minority shareholders should be made as nearly whole as possible by requiring Signal to pay to them the value of what the stock would be worth if it could be returned to them now." *Id.* That calculation proved overly speculative on the facts of the case, so the Chancellor's remedial focus turned to "the fair value of that which is taken from the shareholder," *i.e.*, the value of his proportionate interest in a going concern. *Id.* at *7. In crafting the specific remedy, the Chancellor Brown noted that a 50% premium over the unaffected trading price of UOP would have generated a price in the vicinity of $22 per share, and he found credible the view of the defendant's expert that the fair value of UOP was between $20–$22 per share. Chancellor Brown concluded that "a price of $22 per share would not have been out of line for the acquisition," and he awarded $1 per share in damages. *Id.* at *10.

Two other Court of Chancery deci-

---

pursuant to 8 *Del. C.* § 262 except where an appraisal would be inadequate."); *Rabkin v. Philip A. Hunt Chem. Corp.*, 480 A.2d 655, 659 (Del.Ch.1984) ("The viability of plaintiffs' entire fairness claim turns upon whether, following [*Weinberger*], appraisal is an adequate remedy for plaintiffs under the facts alleged. In *Weinberger* the Delaware Supreme Court expanded the remedy available through appraisal and limited the circumstances under which a stockholder may attack a cash-out merger through an entire fairness claim." (internal citation omitted)), *rev'd*, 498 A.2d 1099 (Del.1985).

**30.** *See generally, e.g., Glassman v. Unocal Exploration Corp.*, 777 A.2d 242, 246–47 (Del. 2001); *Andra v. Blount*, 772 A.2d 183, 184 (Del.Ch.2000); *Wood v. Frank E. Best, Inc.*, 1999 WL 504779, at *4–5 (Del.Ch. July 9, 1999).

**31.** *See Weinberger v. UOP, Inc.*, 1985 WL 11546, at *1 (Del.Ch. Jan. 30, 1985) (explaining that the Supreme Court "[found] that Signal, as majority shareholder of UOP, had not dealt fairly with UOP's minority shareholders because of the failure of the proxy statement ... to disclose certain information found by the Supreme Court to be material"); *id.* at *2 ("It seems obvious to me that the finding by the Supreme Court that Signal had not dealt fairly with the UOP minority equates to a finding that Signal was guilty of misrepresentation in presenting the facts relating to the proposed merger to the UOP minority.").

sions—*Steiner*[32] and *Ocean Drilling*[33]—discussed the availability of quasi-appraisal damages in the course of denying applications for injunctive relief. In *Steiner*, Chancellor Allen was presented with an application to restrain a majority stockholder's exchange offer. The offer was the first step of a two-step transaction and would be followed by a stock-for-stock merger at the same exchange ratio. 1991 WL 40872, at *1. Chancellor Allen focused on the controlling stockholder's ability to effectuate the transaction unilaterally:

A significant fact here is that, given the majority stockholding of Collins, it is inescapably the fact that Collins has the legal power to effectuate a merger between Sizzler and Collins, or a subsidiary of Collins, on such terms as Collins will fix. In such a merger ... minority shareholders are protected by the imposition of an obligation on the controlling shareholder to act fairly—that is, the controlling shareholder must pay a fair price and otherwise follow a fair procedure, including full disclosure. The critical determination whether the exchange ratio here employed does fairly compensate plaintiff, however, is one that can be made post-merger as effectively as it could be made now. . . .

*Id.* at *1. Chancellor Allen noted if the plaintiff could establish a disclosure violation, "[the] court, upon proof of that fact, is empowered to afford a remedy that would be fully sufficient. That is, the court may establish a 'quasi-appraisal' remedy designed to give to each tendering shareholder the equivalent of the appraisal remedy." *Id.* at *2. Such a remedy would provide stockholders with the fair value of their shares, and Chancellor Allen held that the stockholders therefore did not face a threat of irreparable harm and denied the application. *Id.*

In *Ocean Drilling*, Chancellor Chandler, then a Vice Chancellor, likewise denied an application to enjoin a controlling stockholder's first-step exchange offer due in part to the availability of quasi-appraisal damages:

Because a quasi-appraisal remedy is available to even tendering shareholders where a showing can be made that the controlling stockholder or board have breached their fiduciary duties to the minority shareholders, if the plaintiffs are correct with respect to their non-disclosure or coercion claims a remedy will be available to them should I not order the injunction. While such a remedy involves a significant expenditure in terms of time and legal fees, the "irreparability" of any harm caused by the defendants' conduct is limited to a large extent by the availability of the quasi-appraisal remedy.

1991 WL 70028, at *7. The first-step exchange in *Ocean Drilling* was conditioned on receipt of a majority of the minority shares, so both rationales for quasi-appraisal damages applied: armed with all material information, stockholders might (i) reject the offer and keep their proportionate share of the going concern or (ii) seek appraisal. *See id.* at *5; *see also Taylor v. LSI Logic Corp.*, 1995 WL 405737, at *3 (Del.Ch. June 19, 1995) (denying a motion to expedite application to enjoin the acquisition of a Canadian company because the relevant Canadian statute provided a remedy similar to quasi-appraisal and, as a result, "the injury complained of by plaintiff may not be irreparable").

---

**32.** *Steiner v. Sizzler Rests. Int'l, Inc.*, 1991 WL 40872 (Del.Ch. Mar. 19, 1991) (Allen, C.).

**33.** *In re Ocean Drilling & Exploration Co. S'holders Litig.*, 1991 WL 70028 (Del.Ch. Apr. 30, 1991).

An even more significant decision for the development of quasi-appraisal was *Arnold v. Society for Savings Bancorp, Inc. (Arnold III)*, 1995 WL 376919 (Del.Ch. June 15, 1995), *aff'd*, 678 A.2d 533 (Del.1996). Unlike *Weinberger, Steiner,* and *Ocean Drilling,* which involved controlling stockholder squeeze-outs, *Arnold* involved an arm's length, third party, stock-for-stock merger. The Court of Chancery had held that the defendant directors had not breached their fiduciary duty of disclosure and granted summary judgment for the defendants. *See Arnold v. Soc'y for Sav. Bancorp, Inc. (Arnold I)*, 1993 WL 526781, at *12 (Del.Ch. Dec. 17, 1993), *rev'd in part*, 650 A.2d 1270 (Del.1994). On appeal, the Delaware Supreme Court reversed in part, holding that the defendant directors failed to disclose material information in the form of a bid for the target corporation's major subsidiary. *See Arnold II*, 650 A.2d at 1281. The Supreme Court also held that a Section 102(b)(7) provision protected the individual defendants against any personal liability for the disclosure violation. *Id.* at 1286–87. The Supreme Court remanded the case for the trial court to determine whether the corporate defendants could be held liable. *Id.* at 1291.

On remand, the plaintiff contended that he could seek quasi-appraisal from the corporate defendants. *Arnold III*, 1995 WL 376919, at *4. Although the Court of Chancery rejected the plaintiff's request for quasi-appraisal on the facts of the case, the court, citing *Steiner* and *Ocean Drilling*, explained that when a fiduciary has breached its duties, "the Court [can] assess damages, calculated through a quasi-appraisal proceeding." *Id.* at *6. The court clarified that "[u]sed in this manner, the quasi-appraisal is not an equitable remedy, but a method of calculating legal damages." *Id.* As an example, the court cited *Wacht v. Continental Hosts, Ltd.*,

1994 WL 525222 (Del.Ch. Sept. 16, 1994), where a majority stockholder effectuated a long-form squeeze-out merger that was approved by written consent. The Court of Chancery in *Wacht* held that the subsidiary directors and the majority stockholder breached their duty of disclosure by failing to provide any information about how the merger price was determined. The *Wacht* court awarded quasi-appraisal damages, defined as "damages amounting to the fair value of Continental as of the merger date, less the $12 per share merger consideration." *Id.* at *4. This amount worked out to $4.90 per share. *Id.* at *7.

The *Arnold III* decision is not alone in holding that quasi-appraisal damages could be an appropriate remedy for disclosure violations in a third party merger. In *Turner v. Bernstein*, 776 A.2d 530 (Del.Ch. 2000), the directors of GenDerm Corporation, a private corporation whose stock was owned by approximately 150 record holders, provided only cursory information when soliciting consents in favor of a third-party merger with Medicis Pharmaceutical Corporation in December 1997. Chief Justice Strine, writing while a Vice Chancellor, granted summary judgment on the issue of liability, ruling that the defendant directors breached their duty of disclosure by failing "to put together a disclosure containing any cogent recitation of the material facts." *Id.* at 542. In a related decision, then-Vice Chancellor Strine recognized that either quasi-appraisal or rescissory damages could be appropriate. *Turner v. Bernstein*, 768 A.2d 24, 39 (Del. Ch.2000).

As these decisions show, quasi-appraisal damages are one possible remedy for breaches of the duty of disclosure, and the availability of the quasi-appraisal damages measure is not limited to short-form mergers. But more importantly, as noted at the outset, the quasi-appraisal damages

measure is simply a remedy, and it can be awarded for other breaches of fiduciary duty as well. Justice Jacobs, writing as a Vice Chancellor, summarized this principle nicely:

> The traditional measure of damages is that which is utilized in connection with an award of compensatory damages, whose purpose is to compensate a plaintiff for its proven, actual loss caused by the defendant's wrongful conduct. To achieve that purpose, compensatory damages are measured by the plaintiff's "out-of-pocket" actual loss. Thus, where a merger is found to have been effected at an unfairly low price, the shareholders are normally entitled to out-of-pocket (i.e., compensatory) money damages equal to the "fair" or "intrinsic" value of their stock at the time of the merger, less the price per share that they actually received.

*Strassburger*, 752 A.2d at 579; *accord Tremont I*, 1996 WL 145452, at *9 (explaining that in a cash out merger or other forced sale, "the shares, even if not entitled to participate in the majority shareholders 'control premium,' must carry at a minimum the *pro rata* value of the entire firm as a going enterprise" (footnote omitted)). It therefore should come as no surprise that this court has conducted consolidated breach of fiduciary duty and appraisal proceedings and awarded the same damages measure in both cases.[34]

In this case, if the defendants fail to prove that the merger was entirely fair, then quasi-appraisal damages would be one form of possible remedy. To calculate quasi-appraisal damages, the court would determine the intrinsic value of Orchard's common stock using standards applied in an appraisal, then subtract the amount of the merger consideration. In this case, the appraisal decision already has determined the intrinsic value of Orchard's common stock to be $4.67 per share, and the amount of the merger consideration was $2.05 per share. The measure of quasi-appraisal damages, if the court were to find that remedy appropriate, would be $2.62 per share. Determining which defendants could be held liable for such an award is a separate inquiry where affirmative defenses like exculpation under Section 102(b)(7) and reliance on experts under Section 141(e) potentially apply. *See* 8 *Del. C.* §§ 102(b)(7), 141(e).

### b. Quasi–Appraisal After A Short–Form Merger

As noted, the defendants argue for an artificially limited concept of quasi-appraisal in which that damages measure only would be available after a short-form merger. The defendants have correctly identified a subset of causes of action where the quasi-appraisal damages remedy can be awarded, but it does not follow that this is the only situation in which quasi-appraisal damages can be awarded. Contrary to the defendants' position, the Delaware Supreme Court's decision in

---

**34.** *See, e.g., PNB Hldg.*, 2006 WL 2403999, at *1 ("I conclude that the fair value of a share of PNB on the date of the merger was $52.34, which is $11.34 per share higher than the consideration offered in the merger. Therefore, ... the [plaintiffs who brought entire fairness claims] will receive $11.34—the damages resulting from the unfair merger."); *Del. Open MRI Radiology*, 898 A.2d at 342–44 (finding company's per-share value, then using that "as the basis for a conclusion that the merger was not financially fair to the squeezed-out minority ... as a matter of equity," and granting the same amount as damages); *Emerging Commc'ns*, 2004 WL 1305745, at *24 (finding that "fair value" was $38.05, stating that "[f]rom that fair value finding it further follows that the $10.25 per share merger price was not a 'fair price' within the meaning of the Delaware fiduciary duty case law beginning with *Weinberger*," and granting the difference as damages).

*Berger v. Pubco Corp.*, 976 A.2d 132 (Del. 2009), supports using quasi-appraisal damages as a remedy for disclosure violations.

The current legal framework for analyzing short-form mergers stems from *Glassman*, 777 A.2d 242. There, the Delaware Supreme Court considered "the fiduciary duties owed by a parent corporation to the subsidiary's minority stockholders in the context of a 'short-form' merger." *Id.* at 243. The Supreme Court started by recognizing that "[u]nder settled principles, a parent corporation and its directors undertaking a short-form merger are self-dealing fiduciaries who should be required to establish entire fairness, including fair dealing and fair price." *Id.* at 247. In a short-form merger, however, the Section 253 "authorizes a summary procedure that is inconsistent with any reasonable notion of fair dealing." *Id.* By authorizing a parent corporation to eliminate minority stockholders through the simple expedient of filing a certificate of ownership and merger, the General Assembly cabined the role of equity and eliminated the aspect of fair process. *See id.; see also* 8 *Del. C.* § 253(a). On the aspect of fair price, Section 253(d) gives stockholders the right to seek a statutory appraisal and receive a judicial determination of fair value after any short-form merger. *See* 8 *Del. C.* § 253(d). As *Weinberger* held, the fair value standard and the fair price aspect of entire fairness employ the identical standard. *Weinberger*, 457 A.2d at 713–14. Section 253 therefore supplants both aspects of the entire fairness inquiry, and the Delaware Supreme Court held that "[i]n order to serve its purpose, § 253 must be construed to obviate the requirement to establish entire fairness." *Glassman*, 777 A.2d at 248. Because appraisal provided a fully adequate remedy in the context of Section 253, the Delaware Supreme Court held that "absent fraud or illegality, appraisal is the exclusive remedy

available to a minority stockholder who objects to a short-form merger." *Id.*

As part of its holding, however, the Delaware Supreme Court stressed that "the duty of full disclosure remains, in the context of this request for stockholder action." *Id.* at 248. Controlling stockholders continue to owe fiduciary duties, and although Section 253 displaces both the fair process and fair price aspects of the entire fairness inquiry, it does not eliminate the need for disclosure. The Delaware Supreme Court's emphasis of this point in *Glassman* comported with the Court of Chancery decision that the high court affirmed, which noted that a parent corporation in a short-form merger "bears the burden of showing complete disclosure of all material facts relevant to a minority shareholder['s] decision whether to accept the short-form merger consideration or seek an appraisal." *In re Unocal Exploration Corp. S'holders Litig.*, 793 A.2d 329, 351–52 (Del. Ch.2000) (quoting *Shell Petroleum, Inc. v. Smith*, 606 A.2d 112, 114 (Del.1992)). The trial court similarly had held that the reference to "fraud" that could render appraisal inadequate encompassed "concepts of both legal and equitable fraud." *Id.* at 347 n. 91 (citing *Weinberger*, 457 A.2d at 714, as "referring, pertinently, to 'fraud, misrepresentation ... deliberate waste of corporate assets, or gross and palpable overreaching' "). The Court of Chancery concluded that appraisal was the exclusive remedy for the stockholder plaintiffs in *Unocal Exploration* only after finding that the parent corporation had provided full disclosure of all material facts and had not engaged in any other types of fraud, equitable fraud, or illegality. *Id.* at 351–55.

The question that remained after *Glassman* was what remedy would be available for a stockholder plaintiff who succeeded in showing that a parent corporation failed to provide full disclosure in connection

with a short-form merger. In *Gilliland v. Motorola, Inc.*, 873 A.2d 305 (Del.Ch.2005), the Court of Chancery held that because appraisal was a stockholder's exclusive remedy following a short-form merger, the equitable remedy for a breach of the duty of disclosure in connection with a short-form merger should seek to re-create the appraisal right that the stockholder lost. *Id.* at 312. This approach reasoned that if a statutory appraisal was the best that stockholders could get after a short-form merger, it would penalize the defendant corporation and confer a windfall on the stockholder plaintiffs for equity to grant stockholders greater rights in the form of a procedurally more advantageous class-wide claim with the potential for quasi-appraisal damages at the end. *Id.* at 313. The *Gilliland* court therefore constructed a remedy that sought to replicate the appraisal statute by requiring stockholders to opt into the quasi-appraisal class and to escrow a portion of the merger consideration. *Id.* at 313–14. The Court of Chancery imposed a similar form ·of statutory replication at the trial level in *Berger v. Pubco Corp.*, 2008 WL 2224107 (Del.Ch. May 30, 2008), *rev'd*, 976 A.2d 132 (Del. 2009).

On appeal in *Berger*, the Delaware Supreme Court rejected the statutory replication approach as an appropriate remedy for breaches of the fiduciary duty of disclosure. In reasoning through the issues, the high court started from a different premise than the Court of Chancery in *Gilliland*. Rather than viewing a statutory appraisal as the most to which minority stockholders are entitled in a short-form merger, the Delaware Supreme Court reasoned that minority stockholders are entitled to have the majority stockholder comply with its fiduciary duty of disclosure. 976 A.2d at 134. "Where ... the material facts are not disclosed, the controlling stockholder forfeits the benefit of" Section 253 and the limited judicial review that accompanies the use of the statute. *Id.* In a scenario where the majority stockholder has not complied with its duty of disclosure, stockholders are entitled to more than a statutory appraisal: they are entitled to remain as holders of equity in the corporation as a going concern. The Delaware Supreme Court therefore held that the appropriate remedy for a breach of the duty of disclosure in connection with a short-form merger is not to replicate the appraisal statute. *See id.* at 142–44. It is rather to compensate the minority stockholders for the loss of their status as holders of equity in a going concern. The resulting remedy ends up being essentially the same as the remedy for a breach of the duty of disclosure in connection with a long-form merger: a class-wide action for a breach of the fiduciary duty of disclosure, without any requirement to opt-in or to escrow a portion of the merger proceeds, in which damages can be calculated and awarded using the quasi-appraisal measure of out-of-pocket loss. *Id.* at 145.

Because the current case involved a long-form merger rather than a short-form merger, the *Berger* decision is not directly applicable. The Delaware Supreme Court's reasoning in *Berger*, however, demonstrates the viability of using a class-wide award of out-of-pocket damages measured using quasi-appraisal as a remedy for breach of the duty of disclosure. *Berger* thus supports, rather than undermines, the availability of quasi-appraisal damages as one possible remedy should the court find that the defendants breached their duty of disclosure in connection with the merger and that those breaches contributed to a finding that the merger was not entirely fair.

#### 4. *Transkaryotic*

As their final argument in favor of a ruling on summary judgment barring any

damages award, the defendants argue strenuously that in *In re Transkaryotic Therapies, Inc.*, 954 A.2d 346 (Del.Ch. 2008), this court held that monetary damages for a breach of the duty of disclosure cannot be awarded after a merger closes. The holding of *Transkaryotic* is not so broad, and its reasoning does not support such a dramatic result.

The *Transkaryotic* case involved a third party, arm's length merger, and the corporation had an exculpatory provision in its charter. Consistent with other Court of Chancery decisions, the *Transkaryotic* case sought to encourage plaintiffs to bring disclosure claims before a merger vote so that any additional information that the litigation produced would be provided to other stockholders.[35] After an extensive discussion of the pros and cons of post-closing relief, the *Transkaryotic* court stated:

> I hold that this Court cannot grant monetary or injunctive relief for disclosure violations in connection with a proxy solicitation in favor of a merger three years after that merger has been consummated and where there is no evidence of a breach of the duty of loyalty or good faith by the directors who authorized the disclosures.

*Transkaryotic*, 954 A.2d at 362. That ruling was a straightforward application of the Delaware Supreme Court's decision in *Arnold II*, which held that a Section 102(b)(7) provision protected the individual defendants against any personal liability for the disclosure violation in an arm's length merger where the fiduciary breach

was not a product of disloyalty. 650 A.2d at 1287.

The holding of *Transkaryotic* does not apply to this case because the claims touch on issues of loyalty. The merger was not an arm's length transaction. It was a squeeze out that created an inherent conflict for Dimensional and individuals affiliated with Dimensional. There is also sufficient evidence to give rise to triable issues of fact about the loyalty and good faith of the directors who authorized the disclosures. Monetary relief therefore remains a possible remedy, even under *Transkaryotic*.

Moving beyond *Transkaryotic's* actual holding, one finds in the decision the broader language that the defendants have embraced. In the course of discussing the advantages of a pre-stockholder vote adjudication of disclosure claims, the *Transkaryotic* court noted that under Delaware law, "a breach of the disclosure duty leads to *irreparable harm.*" 954 A.2d at 361. The decision then stated that

> The corollary to this point, however, is that once this irreparable harm has occurred—*i.e.*, when shareholders *have voted* without complete and accurate information—it is, by definition, too late to remedy the harm. If the Court could redress such an informational injury after the fact, then the harm, by definition, would not be irreparable, and injunctive relief would not be available in the first place.

*Id.* (footnote omitted). In support of this reasoning, the decision cited the Delaware Supreme Court's decision in *Loudon*,

---

35. *Id.* at 360; *see In re Staples, Inc. S'holders Litig.*, 792 A.2d 934, 960 (Del.Ch.2001) (same); *Sonet v. Plum Creek Timber Co.*, 1999 WL 160174, at *11 (Del.Ch. Mar. 18, 1999) (enjoining the forthcoming vote until the defendants cured the disclosure deficiencies); *Gilmartin v. Adobe Res. Corp.*, 1992 WL

71510, at *13 (Del.Ch. Apr. 6, 1992) (observing that "[t]he right to cast an informed vote is specific, and its proper vindication in this case requires a specific remedy such as an injunction, rather than a substitutionary remedy such as damages").

which stated: "Injunctive relief in the form of corrective disclosures and resolicitation may be appropriate if the matter is addressed in time by a court of equity. It is difficult to see how damages may also be available in such a case." *Loudon v. Archer–Daniels–Midland Co.*, 700 A.2d 135, 141 (Del.1997) (footnote omitted). Based on this passage from *Transkaryotic* and the reference to *Loudon*, the defendants argue that monetary relief cannot be awarded for a disclosure violation in a post-closing action.

As I read *Loudon*, the Delaware Supreme Court was making the basic point that if a court has granted an injunction requiring corrective disclosures, and if the information has been provided, then the harm has been cured and it is difficult to see how money damages also would be available for the same violation. The decision does not seem, at least to me, to be making a broader claim that post-closing damages can never be awarded for a breach of the duty of disclosure. To the contrary, the *Loudon* court was plainly conscious of the fact that damages *could* be awarded, and one of the central holdings of the decision was to cut back on *dictum* from *In re Tri–Star Pictures, Inc., Litig.*, 634 A.2d 319 (1993), which commented that "[i]n Delaware existing law and policy have evolved into a virtual *per se* rule of damages for breach of the fiduciary duty of disclosure." *Id.* at 333. The *Loudon* court limited *Tri–Star's* dictum to the facts of the case and held that to obtain damages for a disclosure violation, the plaintiff must show that the dis-closure breach caused "deprivation to stockholders' economic interests or impairment of their voting rights." 700 A.2d at 147; *see id.* at 142 (limiting *Tri–Star* as standing "for the narrow proposition that, where directors have breached their disclosure duties in a corporate transaction that has in turn caused impairment to the economic or voting rights of stockholders, there must at least be an award of nominal damages"). The upshot of *Loudon* was therefore to *preserve* the ability of stockholders to obtain money damages for disclosure violations under those circumstances. Other passages in *Loudon* similarly refer to the possibility of a post-closing, monetary damages remedy for a breach of the duty of disclosure, assuming the necessary showing was made.[36]

In this case, any disclosure violations in connection with the merger caused a deprivation to the stockholders' economic interests and an impairment of their voting rights. The merger was conditioned on a majority-of-the-minority vote, so with full disclosure, stockholders could have voted against the merger, stopped the transaction, and remained holders of equity in a going concern. Instead, their stock was converted into the right to receive $2.05 per share in cash. That would seem to be precisely the situation where *Loudon* contemplated the potential for some type of monetary remedy, including, if appropriate, an award of nominal damages.

Considered on its own terms, the logical corollary of a showing of irreparable harm

---

**36.** *See id.* at 137–38 ("Whether or not a failure to fulfill [the duty of disclosure] will result in personal liability for damages against directors depends upon the nature of the stockholder action that was the object of the solicitation of stockholder votes and the misstated or omitted disclosures in connection with that solicitation."); *id.* at 138 ("There may also be a potential damage remedy where the mis-statement or omission implicates the stockholders' economic or voting rights."); *id.* at 141 n. 20 (noting that in a case where damages for breach of a duty of disclosure were "theoretically available, [a corporation's] certificate of incorporation may eliminate the availability of monetary damages ... under the authority of 8 *Del. C.* § 102(b)(7)").

that the *Transkaryotic* decision cited does not lead to a remedial impasse. It is true that once the stockholder vote has been held, certain aspects of the harm are irreparable. A court cannot reverse time and provide stockholders with a new vote with the additional information but under otherwise identical circumstances. Any new vote that the court orders will take place under at least somewhat different circumstances than the original vote (a fact that is likewise true, albeit to a lesser degree, when a vote is delayed to permit the issuance of additional disclosures). But if a stockholder has been deprived of property (shares) because of false or misleading disclosures, a court can compensate stockholders with the monetary value of the lost property (the fair value of the shares less the merger consideration). The fact that a monetary remedy cannot perfectly replicate the original decision does not mean that no remedy should be awarded. It rather means that the equitable remedy of pre-vote relief is superior and preferable.

In other contexts involving claims of irreparable harm, the inability to provide fully-adequate equitable relief does not mean that no remedy is awarded. It means that the plaintiff must make do with an admittedly less perfect substitute. In a basic contract action, for example, specific performance might be the preferred remedy because the contract relates to a unique property right. But if a court lacks the ability to order specific performance, it does not mean that the plaintiff is out of luck. The plaintiff instead must consider other, less ideal remedial options. The same is true with a breach of the duty of disclosure.

 To the extent that the court in *Transkaryotic* was troubled by the problem that stockholders might too easily obtain a post-closing award of damages for a breach of the duty of disclosure, Delaware

decisions have distinguished between the showing required to obtain injunctive relief and the showing required to obtain money damages. When seeking injunctive relief for a breach of the duty of disclosure in connection with a request for stockholder action, a plaintiff need only show a material misstatement or omission. The plaintiff need not address the "elements of reliance, causation and actual quantifiable monetary damages." *In re J.P. Morgan Chase & Co. S'holder Litig.*, 906 A.2d 766, 775 (Del. 2006) (citing *Malone*, 722 A.2d at 12). When seeking post-closing damages for breach of the duty of disclosure, however, the plaintiffs must prove quantifiable damages that are "logically and reasonably related to the harm or injury for which compensation is being awarded." *Id.* at 773. In other words, although the request for stockholders to take action based on the disclosures may satisfy the requirement of reliance, the plaintiff still must prove causation and damages. *See In re Wayport, Inc. Litig.*, 76 A.3d 296, 314–15 (Del.Ch.2013) ("A failure to disclose material information in [the context of a request for stockholder action] may warrant an injunction ... but will not provide a basis for damages from defendant directors absent proof of (i) a culpable state of mind or non-exculpated gross negligence, (ii) reliance by the stockholders ..., and (iii) damages proximately caused by that failure."). In a controlling stockholder case like this one, those issues are subsumed within the entire fairness test.

In my view, in an appropriate case Delaware law continues to recognize the possibility of a post-closing award of damages as a remedy for a breach of the fiduciary duty of disclosure. Whether this case will result in an award of damages can only be determined after trial.

### E. Orchard's Potential Liability

 Orchard itself has moved for summary judgment, claiming it cannot be held

liable on any of the plaintiffs' theories. The plaintiffs' claim against Orchard sounds predominantly in breach of fiduciary duty. Summary judgment is properly granted to Orchard on such a claim: The fiduciaries who serve the entity owe fiduciary duties; the entity that is served does not. *Wayport,* 76 A.3d at 322–23; *see also A.W. Fin. Servs., S.A. v. Empire Res., Inc.,* 981 A.2d 1114, 1127 n. 36 (Del.2009). After the defendants raised this issue in their opening briefs, the plaintiffs attempted to recast their fiduciary duty claim against Orchard as one for aiding and abetting. Summary judgment is properly granted to Orchard on that claim as well: A corporation cannot aid and abet violations by the fiduciaries who serve it. *Arnold v. Soc'y for Sav. Bancorp, Inc. (Arnold IV),* 678 A.2d 533, 539 (Del.1996).

### III. CONCLUSION

Summary judgment is granted declaring that (i) the notice of merger contained a material misstatement, (ii) the standard of review at trial will be entire fairness with the burden of persuasion on the defendants, (iii) the disclosure that the Series A's liquidation preference constituted an on-going liability of the Company was accurate, and (iv) Orchard cannot be held liable for a breach of fiduciary duty or for aiding and abetting a breach of fiduciary duty. Otherwise, the summary judgment motions are denied.